```
1                    UNITED STATES DISTRICT COURT.

2                      DISTRICT OF CONNECTICUT

3    _____
     DANIEL PIROSCAFO              )
4                  Plaintiff.  )  NO: 3:08cv1753(JCH)
                                  )
5    vs.                          )  June 19, 2012
                                  )
6    METRO NORTH RAILROAD CO.     )
                   Defendant.  )
7    _____
                                    915 Lafayette Boulevard
8                                   Bridgeport, Connecticut

9                    EXCERPT OF TRIAL
                     Testimony of Michael Hopkins
10                   and Anthony Bottalico

11
     B E F O R E:
12                   THE HONORABLE JANET C. HALL, U.S.D.J.
                     And Jury
13
     A P P E A R A N C E S:
14

15   FOR THE PLAINTIFF   :      Steven Lawrence Kantor
                                Kantor & Godwin, PLLC
16                              5800 Main Street
                                Williamsville, NY 14221
17

18

19   FOR THE DEFENDANT   :      Robert O. Hickey
                                707 Summer Street
20                              Stamford, CT 06901

21

22

23

24   Court Reporter    :    Terri Fidanza, RPR

25   Proceedings recorded by mechanical stenography,
     transcript produced by computer.
```

1          (Excerpt of trial testimony.

2          MR. CANTOR:  We call Michael Hopkins.

3          THE COURT:  Mr. Hopkins, if you can come up to

4     the witness stand area.  When you arrive, I ask that you

5     remain standing.  The Clerk is going to administer an

6     oath to you.

7                    MICHAEL HOPKINS

8     Having been called as a witness, was first duly sworn and

9          testified on his/her oath as follows:

10          THE CLERK:  Please state your name, spell your

11     last name, city state of residence.

12          THE WITNESS:  Michael Hopkins, H-o-p-k-i-n-s, I

13     live in Stamford, Connecticut.

14          THE COURT:  Thank you.  You may be seated,

15     Mr. Hopkins, and welcome and good afternoon to you.

16     Whenever you are ready, Attorney Cantor.

17     DIRECT EXAMINATION BY MR. CANTOR:

18          Q.  Mr. Hopkins, can you give us some background

19     information regarding your family?

20          A.  I have a wife and two children.  We have a house

21     in the Springdale section of Stamford.  I work in Midtown

22     Manhattan.

23          Q.  Can you adjust the microphone so you are

24     speaking into it.

25          THE COURT:  If you are this far away, it

1    maximizes the sound but minimizes the P blowing.

2              THE WITNESS:  Is that better?

3              THE COURT:  A little bit closer I think.

4         Q.  Can you give us some background information on

5    your education?

6         A.  I went to New York University.  I have a

7    bachelor's degree in business administration.

8         Q.  Where are you currently employed?

9         A.  I work for TIAA CREF in Midtown Manhattan.  It

10   is an insurance and a pension management firm.

11        Q.  What do you do for them?

12        A.  I manage the data center for them in the

13   regional offices.

14        Q.  Back in February 2008, did you ride MetroNorth

15   Railroad?

16        A.  Yes.

17        Q.  How frequently would you use MetroNorth

18   Railroad?

19        A.  I used MetroNorth railroad five days a week at

20   least.

21        Q.  Back in February of 2008, was there a particular

22   station that you frequented?

23        A.  Springdale station is the station I normally

24   travel out of.

25        Q.  Is it fair to say that you are familiar with

1    that station?

2          A.   Yes, I am.

3          Q.   During the week Monday through Friday was there

4    a particular train that you regularly took into the city?

5          A.   Monday and Friday I normally take an early train

6    the 6:30 or 7:20 train.

7          Q.   What time does that arrive in the city?

8          A.   Approximately an hour later at Grand Central

9    Terminal.

10         Q.   On occasion, would you also take weekend

11   trains from there?

12         A.   Yes, I take the train on Saturday and Sunday if

13   I have to go in the office and do something.

14         Q.   What train would you normally take on weekends?

15         A.   I get the 6:30 train on the weekends or 7:30

16   train the latest.

17         Q.   So the 6:30 train would leave Springdale at 6:30

18   and arrive at the city when?

19         A.   7:30, a little bit longer.  There's a transfer.

20   You have to change.  You have that lag when you transfer

21   in Stamford.

22         Q.   When you took the train on weekends, did you

23   have a practice that you normally followed as to how you

24   would go from your house to the station?  What time you

25   would arrive and regular procedures as to what you would

1    do?

2        A.   Yeah, pretty much cut, dry and simple.  I go

3    down my street and down Hope Street.  Hope Street is

4    where the Springdale parking lot is for that station.

5    Park at the parking lot.  I have a permit to park there

6    and wait on the platform for the train to come in.

7        Q.   Can you tell us the route you would take from

8    where you park to the platform?

9        A.   Yeah.  Generally at that point, I have to get on

10   at the center of the station pretty much.  The problem on

11   the weekends, it is only a few cars, not like during the

12   week.  You tend to wait in the middle of the platform or

13   towards part of it.  That particular morning I remember

14   going up the staircase to the platform, so I parked near

15   the staircase and went up to the platform there.  There

16   is a little shelter at the top of the platform.

17       Q.   Once you walk up the staircase and arrive on the

18   platform, can you describe for the jury approximately how

19   far you have to walk to get from where you are on the

20   platform to where you are going to board the train?

21       A.   Probably 20, 30 feet.

22       Q.   Have you observed MetroNorth Railroad at the

23   Springdale station?

24       A.   On that particular morning.

25       Q.   Prior to February 2008, have you observed

1      MetroNorth employees as the station?

2          A.   Generally, no.

3          Q.   Prior to February 23, 2008, have you ever

4      observed conductors step off the train at the station to

5      observe passengers boarding and detraining?

6          A.   Yes.

7          Q.   And regarding the Springdale platform prior to

8      February 23, 2008, were there occasions where you

9      observed the Springdale station platform as being salted

10     or sanded?

11         A.   Prior to the date?

12         Q.   Not on this date but on prior occasions?

13         A.   Yeah.  On prior occasions, it's been sanded and

14     shoveled clear.

15         Q.   Did you use the Springdale station platform on

16     Saturday, February 23, 2008?

17         A.   Yes, I did.

18         Q.   Can you tell us approximately what time you

19     arrived at the Springdale station?

20         A.   Shortly before 6:30.

21         Q.   You were there shortly before 6:30 in the

22     morning?

23         A.   Yes.

24         Q.   And what did you observe regarding the

25     Springdale station platform that morning?

1        A.   I observed that the platform was a sheet of ice

2   and the stairs going up and the platform was icy that

3   morning.

4        Q.   Was the Ice from the point that you entered the

5   platform at the stairs to the point where the platform

6   ended for you to board the train?

7        A.   I'm sorry.  Could you say that again, please?

8        Q.   Did the ice take up the entire platform?

9        A.   Yes, the entire platform was a sheet of ice.

10        Q.   Had the platform been salted or sanded at that

11   point in time, 6:30 in the morning on February 23, 2008?

12        A.   No.  It had not.

13        Q.   Did it appear that any snow and ice remover had

14   been performed at the Springdale station prior to that

15   morning at 6:30?

16        A.   No, did not appear to be.

17        Q.   Besides yourself, were there other members of

18   the general public present at the Springdale platform

19   that morning?

20        A.   Yes.  There were a few other people getting on

21   the train at that time.

22        Q.   Did the MetroNorth train arrive that you

23   intended to take into the city?

24        A.   Yes, it did.

25        Q.   Tell us what you did once the train arrived?

1     A.   Basically I was standing where the door opens

2     and in order to get from the staircase to the waiting

3     area from the door I had to basically very cautiously

4     shuffle across the platform to avoid slipping.  It was

5     that icy, kind of like the penguin walk.  You shuffle

6     with your feet back and forth to insure you don't fall.

7     Q.   You were walking like a penguin across the

8     ice?

9     A.   Shuffling your feet back and forth and sliding

10    very cautiously.

11    Q.   When the train arrived tell us what you observed

12    the train arrived?

13    A.   The doors opened.  The conduct was standing

14    there.  The first thing he said be careful.  The platform

15    is icy.  He was holding on the door jam with his left

16    hand.  He stepped off the train on the platform.  The

17    next thing I know he spun around and went down on the

18    floor.

19    Q.   Did you subsequently learn that was Daniel

20    Piroscafo?

21    A.   Yes, I did.

22    Q.   You said he was holding on to the door?

23    A.   On to the door jam.  The doors open up.  He

24    cautioned us to be careful about that and he stepped off

25    and immediately he went down.

1          Q.   So did he immediately go down with his very

2     first step?

3          A.   Yes.

4          Q.   What did you observe about the way he fell?

5          A.   He spun around almost in a complete circle, and

6     I remember that when he was done his foot was stuck

7     between the platform and the car itself, and he was a

8     kind of in an awkward position.

9          Q.   Did you observe as to what caused him to fall?

10         A.   I would say it was the Ice.  He put one foot on

11    the ice and he went down.

12         Q.   If I utilize the phrase traction on the

13    platform, do you have an understanding what that means

14    traction?

15         A.   Yes.

16         Q.   Tell us what your understanding is?

17         A.   My understanding of that is when in terms of the

18    platform, when you walk on it, your shoes grip to the

19    platform and you are not moving.  You are pretty much you

20    can walk and not lose your footing.

21         Q.   Can you tell the jury the traction that you had

22    on the platform on February 23, 2008?

23         A.   There was no traction at all.

24         Q.   Prior to February 23, 2008, had you ever met Mr.

25    Piroscafo?

1      A.  No, I did not.

2      Q.  After the accident, were you contacted by

3  MetroNorth Railroad and did you provide statements to the

4  MetroNorth Railroad regarding this incident?

5      A.  Yes, I did.

6      Q.  Were those statements in substance similar to

7  what you testified to here today?

8      A.  Yes, they were.

9      Q.  Prior to testifying today, did you have occasion

10  to speak with me?

11      A.  Yes.

12      Q.  Prior to testifying today, did you also have

13  occasion to speak with a Victor Diamond an investigator

14  that was hired by the Ryan and Ryan law firm?

15      A.  Yes, I did.

16      Q.  On February 23, 2008, as you arrived at the

17  Springdale station of MetroNorth, did you expect it to be

18  sanded or salted?

19      A.  I would expect something to be done at that

20  time.  I mean because you have passengers and commuters

21  that are ready to board that train.  It would be

22  dangerous for them to walk on that.  I wasn't too

23  comfortable when I started to walk on that.

24      Q.  Witnessing the accident, is there anything in

25  your opinion that Mr. Piroscafo did that was unsafe?

1          MR. HICKEY:  Objection, your Honor.

2          THE COURT:  Hold on moment, sir.  Basis for the

3     objection?

4          MR. HICKEY:  Just the foundation.  It is almost

5     an expert opinion.

6          THE COURT:  I think that the question -- there's

7     a problem with the form, the use of the term unsafe.

8     He's described what he observed.  You can ask him what he

9     did.  What the plaintiff did.

10          MR. CANTOR:  Judge --

11          THE COURT:  I think that's a conclusion that has

12     to be decided by the jury in connection with the

13     instructions.

14          MR. CANTOR:  Can we approach briefly?

15             (sidebar)

16          THE COURT:  Yes.

17          MR. CANTOR:  I don't need an expert to talk

18     about walking on ice.  It is something that all of us

19     do.

20          THE COURT:  It is the jury's decision.

21          MR. CANTOR:  It is his lay opinion.  I can ask

22     him his lay opinion as to whether it was safe or

23     unsafe.

24          THE COURT:  You have asked him about the ice.

25     You are asking him whether the plaintiff did anything

 1    unsafe.

 2              MR. CANTOR:  In his opinion.

 3              THE COURT:  He has no knowledge of railroad

 4    rules.  He knows what the conditions were there that day.

 5    He described what your plaintiff did.  It is for the jury

 6    to decide whether what your plaintiff did was unsafe or

 7    not.  I don't think it is an appropriate question.  I

 8    think that it is prejudicial to the defendant because we

 9    don't know what he thinks is unsafe.  So I think you can

10    ask him anything you want to ask him about what he did or

11    he didn't do.  Anything.

12              MR. CANTOR:  Okay.  Thank you.

13                   (End of sidebar.)

14       Q.  After Mr. Piroscafo's accident, did you come to

15    his assistance?

16       A.  Yes.  I and another gentleman tried to help him

17    get up.

18       Q.  Can you tell the jury what you did as far as

19    helping him and take it from there.

20       A.  Well, we tried, the other gentleman and myself

21    tried to get him up.  I was standing inside the car at

22    this point because I knew I can't help him get up in the

23    ice.  I'm going to lose my balance.  If I recall

24    correctly, the other gentleman was on the outside.  The

25    first problem was he had his foot wedged in between.  It

1    took about a minute or two but we managed to get him

2    upright.  He got back into the car.  That was it.  We

3    proceeded to the next station.

4          MR. CANTOR:  Thank you, sir.

5          THE COURT:  Cross-examination.

6    CROSS-EXAMINATION BY MR. HICKEY:

7          Q.  Good afternoon, sir.  Thanks for being here.

8    Just a couple of points.  Did you say that Mr. Piroscafo

9    actually warned you and the other passengers of the

10   slippery condition?

11         A.  Yes.  He warned us to be cautious.

12         Q.  I know this is years later, but do you happen to

13   remember if there was a snow event the day before this

14   incident?

15         A.  I honestly don't recall if there was a snow

16   event.

17         Q.  Fair enough.  Your observation of the platform

18   that morning, did it look like a snowstorm of three to

19   six inches had come down the day before and not been

20   treated or looked like something else that happened?

21         A.  There was no snow that I remember.  I don't

22   remember anything having to be plowed like the parking

23   lot or anything like that.

24         Q.  So did it look like something had happened

25   overnight?  One of those freezing rain events or

1   something like that?

2       A.   It might have been.  I don't know.  All I know

3   when I got there that platform was covered with ice.

4       Q.   When the door first opened, the conductor stood

5   there holding on to the door jam of the car?

6       A.   Right.

7       Q.   From your observation is there any reason why he

8   couldn't look at the platform and the people getting on

9   the train from where he was originally?

10      A.   He couldn't do what?

11      Q.   Sit there and watch the passengers get on?

12      A.   He had to move out of the way for us to get on.

13  There was a gentleman that helped get him up, myself

14  standing in front of the open doorway and generally the

15  conductors usually step off on the platform to watch

16  other passengers getting on and off.  He basically

17  stepped out of the way so we can get in.

18          MR. HICKEY:  Thank you, sir.

19          THE COURT:  Any redirect?

20          MR. CANTOR:  No, your Honor.

21          THE COURT:  You may step down.  Thank you very

22  much.  You are excused.

23          THE WITNESS:  Thank you.

24          THE COURT:  Your next witness.

25          MR. CANTOR:  Anthony Bottalico.

1          THE COURT:  Mr. Bottalico, if you can come up to

2    the witness stand area.  When you arrive, if you remain

3    standing, the clerk is going to administer an oath to

4    you.

5                    ANTHONY BOTTALICO.

6    Having been called as a witness, was first duly sworn and

7              testified on his/her oath as follows:

8          THE CLERK:  Please state your name, spell your

9    last name, city state of residence.

10         THE WITNESS:  Anthony Bottalico,

11   B-o-t-t-a-l-i-c-o.  Poughkeepsie, New York.

12         THE COURT:  You may be seated, Mr. Bottalico.  I

13   apologize for butchering your name.  Whenever you are

14   ready.

15         THE WITNESS:  That is okay.  They did it in high

16   school, too.

17   DIRECT EXAMINATION BY MR. CANTOR:

18        Q.  By whom are you currently employed?

19        A.  The Association of Commuter Rail Employees.

20        Q.  What is the Association of Commuter Rail

21   Employees?

22        A.  We're a labor union that represents operating

23   employees on MetroNorth Commuter Railroad.

24        Q.  When did you get hired by MetroNorth?

25        A.  I was hired in 1976.

1    Q.  And take us from 1976.  Let me ask you this.

2    Before 1976, did you have any prior railroad

3    experience?

4    A.  Just generational from my father.  That's about

5    it.

6    Q.  Take us from '76 up to today.  Tell us in

7    general the job titles that you held with MetroNorth?

8    A.  I was hired as a train assistant conductor they

9    call them now, in June 24, 1976.  I became a conductor in

10   July of 1977, and I did that up until 1993, and then I

11   ran for elective office and became the general chairman

12   of United Transportation Union representing conductors

13   and assistants and maintenance service employees.  Then

14   in 1999, I formed my own union on MetroNorth which is now

15   the Association of Commuter Rail Employees.  I'm the

16   general chairman.  I should say of that union.

17   Q.  Can you explain to the jury what some of the job

18   duties are of a general chairman?

19   A.  General chairman basically handles the

20   Collective Bargaining Agreement for the employees they

21   represent.  That includes negotiating all of the

22   agreements, their benefits and handling grievances,

23   claims, disciplines.  Anything that's covered under the

24   Collective Bargaining Agreement the general chairman

25   would handle.

1      Q.  So you represent both conductors and train

2   men?

3      A.  Yes.

4      Q.  Can you explain to the jury what some of the job

5   duties and responsibilities are of a conductor?

6      A.  Conductor is in charge of the train.  In

7   addition to collecting the revenue, the conductor is

8   responsible doing brake tests, getting the train in and

9   out of the yards, switching the trains from track to

10   track, making announcements on the train, patrolling

11   their train, making sure they are providing customer

12   service.  Conductors also are in charge of the rest of

13   the crew members that they have.  They always have an

14   engineer.  There's a lot of things they do.  So I mean

15   that's pretty much the overall for a conductor.

16      Q.  You talked about making announcements.  Can you

17   give the jury some examples of what responsibilities they

18   have?

19      A.  Sure.  MetroNorth has a Train Service Manual and

20   conductors are responsible for making pre-announcements.

21   That is prior to leaving a station.  For instance, if you

22   are in Grand Central, there's a pre-announcements that

23   conductors make.  When they are on the trains, they are

24   constantly making announcements on the station stops and

25   the destination getting to and from where they are going.

1   Making sure they are safe.  They are putting the luggage

2   in the overhead racks, watching the step getting on and

3   off.  You name it, they make announcements or they try.

4       Q.  Do conductors have any responsibility for

5   stepping on the platform to observe boarding and

6   detraining?

7       A.  Yes.

8       Q.  Can you explain that to the jury?

9       A.  Well, depends upon the location.  If you were in

10  the Grand Central Terminal, we're always on the platform

11  prior to boarding.  And once we leave, we leave our

12  initial terminal, we're required to open the doors.

13  There's supposed to be a crew member that key the door

14  out, stay on the platform until the last person got on.

15  Close that one door.  Signal the conductor to go.

16  Conductors are responsible for viewing the platform --

17  monitoring the platform I should say.

18      Q.  There's a Collective Bargaining Agreement

19  between your union and the railroad, and is it fair to

20  say that you interpret that agreement on behalf of the

21  workers?

22      A.  Yes.  The railroad doesn't always like that but

23  yes.

24      Q.  They have someone who interprets it on behalf of

25  the railroad?

1      A.  Yes.  That would be the Labor Relations

2  Department.

3      Q.  And when we're talking about the rates of pay

4  for conductors are you familiar with those?

5      A.  Yes.

6      Q.  Can you explain to the jury the various

7  components that make up a conductor's rate of pay?

8      A.  Well, there's straight time, there's overtime

9  and then there's arbitrary pay, could be a meal allowance

10  depending how long you are away from home.  No meal

11  payments.  That would basically make up how a conductor

12  is paid every day.

13      Q.  Is it fair to say there's a straight time rate,

14  then depending on the job assignment, there may be some

15  extra components of pay?

16      A.  Absolutely.  All our jobs have a component.  I

17  would say probably 65 percent of our jobs have a

18  component of overtime in them and/or arbitraries.

19      Q.  As of January 1, 2008, do you know what the

20  straight time wage rate was?

21      A.  35.76.

22      Q.  And then on top of that, there could be

23  arbitraries, correct?

24      A.  Yes.  Depending upon the job and how long the

25  job is.  Were you laid off, yes.

1      Q.  So I think you mentioned swing time.  Explain

2    what swing time is?

3      A.  Swing time is that period of time that's

4    downtime where you have no trains and the railroad pays

5    you 75 percent of the straight time, of your straight

6    time.  So in other words, if you did four hours on swing,

7    where you did nothing, they would pay you three hours of

8    straight time.

9      Q.  Swing time could be a reason why you are earning

10   more than your wage rate if you have a job that is swing

11   time?

12     A.  That's correct.

13     Q.  Overtime explain how that works with the

14   conductors on the railroad?

15     A.  Pretty much like everywhere else.  Once you do

16   more than eight hours of I should say straight time, not

17   including swing, you get time and a half.  That's covered

18   under Rule 280.

19     Q.  Meal pay what's that?

20     A.  There's two components of meal pay.  The first

21   component is a meal allowance.  That's a payment where if

22   you swing more than four hours away from your home

23   terminal, the railroad will give you $7 for a meal.  The

24   other component is a no meal payment.  That's where the

25   railroad is supposed to provide a meal period.  If they

1    don't provide a meal period for the day, you don't get to

2    eat, you get paid 45 minutes of straight time.

3        Q.  Do you know Daniel Piroscafo?

4        A.  Yes.

5        Q.  Is he a conductor and member of the Association

6    of Commuter Rail Employees?

7        A.  Yes.

8        Q.  You said the wage rate as of January 1, 2008,

9    $35.76.  Did it go up at all after that?

10       A.  Yes, the last wage increase we received is

11   January 1, 2009.  I believe that was three percent.

12       Q.  What's happened since January 2009 as far as

13   wage increases?

14       A.  Just like everywhere else we haven't been able

15   to negotiate a contract with MTA.  We're in mediation so

16   we haven't had any wage increase since then, so that's

17   the last wage increase.

18       Q.  Mr. Piroscafo was assigned to job C207 on

19   February 23, 2008.  Does each job assignment pay the

20   same?

21       A.  No.  Well, no.  Not for conductors and assistant

22   conductors, no.

23       Q.  Can you explain to the jury how that works?

24       A.  What the railroad wants to be able to do, the

25   railroad wants to have an element of eight hours --

1    people who do eight hours of work, then they want an

2    element of the work force that can cover both parts of

3    the rush hour.  That being the morning rush and the

4    evening rush.  That's why we have swing time.  The

5    railroad doesn't want to pay for downtime so they pay us

6    three quarters of pay when we are on downtime.  Each

7    particular job could be five days of eight hours or five

8    days of 13 hour job with four hours of swing in it.  So

9    it all depends on the job.  Each job would be paid

10   according to what the particular component was entitled

11   to.  It can be complicated.  There's a crew book and the

12   crew book spells out what each job is paid on each day.

13        Q.  Regarding Job C207, do you know what was paid in

14   February 2008?

15        A.  Well, the hourly rate was 35.76.  If my memory

16   serves me that job paid approximately $1767.66 a week, I

17   apologize.

18        Q.  There may be arbitraries depending on the job or

19   is that pretty much it?

20        A.  The only other thing that that job would be paid

21   in addition to the amount that I mentioned would be if

22   something extraordinary happened like there were delays

23   and there was extra overtime paid as a result of the

24   delays.  The conductor wasn't being able to provide a

25   meal on a few of the days.  Other than that, that would

1    be the five days pay for that job.

2         Q.  Do conductors work the same job all through

3    their MetroNorth career?

4         A.  No.  Jobs are based on your seniority.  The more

5    seniority you get, the better job you are going to

6    hold.

7         Q.  Mr. Piroscafo may be working the job C207 one

8    week and the next week he could get bumped based on his

9    seniority to work on another job?

10        A.  Sure.  You can get bumped three times in one

11   week.  That's not unusual.

12        Q.  Are you aware that Mr. Piroscafo was injured on

13   the February 23, 2008?

14        A.  Yes.

15        Q.  And if Mr. Piroscafo misses time from work,

16   contractually is he paid wages?

17        A.  No.

18        Q.  Does MetroNorth have a 401K program?

19        A.  Yes.

20        Q.  Tell us what your understanding is as to how

21   that works.

22        A.  That works like every other 401K.  There's no

23   contribution made by the railroad.  Strictly contribution

24   made by the employee.  If there's no wages, you don't

25   make a contribution.

1      Q.   Contractually if he's not working, he's not

2   getting anything in his 401K?

3      A.   He wouldn't be putting anything in himself.

4      Q.   Let me ask you this: Do MetroNorth employees get

5   vacation?

6      A.   Yes.

7      Q.   How does vacation work on MetroNorth?

8      A.   Depending on the number of years you have of

9   service.  If you have 10 years -- if you have one year of

10   service, you get two weeks; five years, you get three; 10

11   years, you get four; 15 years, you get five; so depending

12   upon the years of service.  I would think Danny would

13   have five weeks of vacation now.

14      Q.   What does he have to do to qualify for that

15   vacation?

16      A.   He has to work 100 days for the year prior.  You

17   earn it in one year and take it in the next.  For

18   instance, if you were going to get vacation in 2013, you

19   have to put in 100 days compensated service in 2012.

20      Q.   If he didn't work 100 days in 2010 because he

21   was off as a result of this incident, does he get

22   vacation in 2011?

23      A.   No.

24      Q.   Are MetroNorth railroad employees such as

25   conductors required to undergo periodic physical exams at

1    the request of MetroNorth?

2         A.   Yes.

3         Q.   Are you aware as to what happens if they do not

4    undergo a requested physical exam?

5         A.   If they don't go?

6         Q.   If they are requested to go to medical and they

7    don't go?

8         A.   They would be disciplined and probably fired.

9         Q.   It would come to your attention as a union rep?

10        A.   Yes, we don't like those.

11        Q.   Do those exams to your knowledge determine the

12   employee's health status and fitness for employment at

13   the request of MetroNorth?

14        A.   Yes, that's correct.

15        Q.   If prior to February 23, 2008, the MetroNorth

16   Railroad Medical Department believed that Mr. Piroscafo

17   had a condition in his foot which would require surgery,

18   contractually were they able to prevent him from

19   working?

20             MR. HICKEY:  Objection, your Honor.

21             THE COURT:  I need to see you at sidebar on that

22   one.

23                  (Sidebar)

24             THE COURT:  Aren't you asking him a hypothetical

25   question?  He's been disclosed as an expert.

1              MR. CANTOR:  He interprets the contract.  They

2      have to go to medical.  I'm asking if they find a

3      condition, can they prevent him from working

4      contractually is what I said.

5              THE COURT:  That's a hypothetical question.

6              MR. CANTOR:  I can't ask my hypothetical of lay

7      witnesses based on his knowledge of the contract?

8              THE COURT:  Attorney Hickey.

9              MR. HICKEY:  I don't understand the foundation

10     or the relevance to this question, your Honor.

11             MR. CANTOR:  I will move on.

12             THE COURT:  Thank you.

13                  (End of sidebar)

14        Q.  We talked a little bit about your understanding

15     of job duties and responsibilities of a conductor but I

16     specifically want to talk about something called an On

17     Board Service Manual.  Can you tell the jury what is

18     that?

19        A.  That's the train service manual.  That's the

20     manual that governs how a crew member would perform his

21     duties.

22        Q.  And do you know if there's a rule that

23     MetroNorth has that requires conductors to open doors at

24     each station?

25        A.  Yes.

1      Q.  And there's a process called keying the door

2   where they open the door, correct?

3      A.  That's correct.

4      Q.  Can you explain to jury how that works?

5      A.  Yes.  After the conductor opens the doors, a

6   member of the crew will be designated what they call the

7   key man.  The key man puts a key in and his door when the

8   conductor closes all the doors, his door would be the

9   last door to close.  That person would be responsible to

10   making sure the platform was clear and nobody was closed

11   in any doors.  You step on the train and close that door.

12   This way everyone knew.  The conductor knew all the doors

13   were closed and nobody was caught in them.

14      Q.  The conductor can step out on the platform and

15   observe the unloading and loading of customers to your

16   knowledge?

17      A.  Oh, sure.

18      Q.  You've observed that process before?

19      A.  I have done that process.

20      Q.  And in your experience as both the conductor and

21   a union official, have you ever been made aware of any

22   circumstances where MetroNorth made -- conductors made

23   announcements such as watch your step when there was no

24   ice or snow present?

25      A.  That's actually an automated announcement today.

1    A lot of new cars have announcements built into them on

2    top of what the conductors do.  That's an automated

3    announcement that's made on every train.  Should be made

4    at every stop.  Watch the gap.  Watch your stuff getting

5    off.  That's standard.

6        Q.  Is there a particular department in MetroNorth

7    that's responsible for inspecting the platforms?

8        A.  Well, in terms of the snow and ice and things

9    like that maintenance, that would be the Track

10   Department.

11       Q.  And do you have an understanding as to when the

12   Track Department is supposed to inspect the platforms?

13       A.  Well, with respect to weather?

14       Q.  Yes.

15       A.  Well, they would always inspect the platforms

16   prior to, you know, service commencing.  Service

17   commencing, you know, so our employees reporting.

18       Q.  So before you put the public or the employees

19   out on platform, it should have been inspected in your

20   opinion, correct?

21       A.  Yes.  Unless obviously it starts in the middle

22   of the day, you try to keep up with it.

23       Q.  Do you have any knowledge as to whether or not

24   MetroNorth monitors the weather conditions?

25       A.  Absolutely.  Since the flood of 1996.  The

1    snowstorm in 1996 weather is like they are preoccupied

2    with the weather especially in the winter.

3        Q.  Can you explain more to the jury about how that

4    procedure works?

5        A.  MetroNorth uses the National Weather Service,

6    and they monitor weather and all for their whole region

7    in the winter constantly.  They monitor it for

8    hurricanes, flooding, heavy rains.  They are constantly

9    on the lookout for that.  Especially after the storm in

10   1996 which caused a lot of destruction on the Hudson and

11   Harlem division.

12       Q.  When employees are injured on the job, does the

13   railroad have a mechanism for claims disputes?

14            MR. HICKEY:  Objection, your Honor.

15            THE COURT:  Basis.

16            MR. HICKEY:  Was it for claims disputes?

17            MR. CANTOR:  Yes.  Does the railroad have a

18   mechanism for claims disputes that he's aware of.

19            MR. HICKEY:  Your Honor, perhaps we should be

20   seen at sidebar.

21                (Sidebar)

22            MR. HICKEY:  This is the mechanism.  I don't

23   know what he's talking about.

24            MR. CANTOR:  He made it seem like some time he

25   filed the claim.  The mechanism on the railroad you file

1    a claim.  You get a lawyer.  Procedurally I'm entitled to

2    explore that.  He opened the door on Mr. Piroscafo.

3              MR. HICKEY:  Maybe yes, maybe no.  It is as if

4    there's some collective bargaining.  This is what this

5    man's history is.  There's some claim to resolve a

6    dispute.

7              MR. CANTOR:  I'm asking is he aware of the

8    process.  I expect him to say you file the claims and get

9    a lawyer.

10             THE COURT:  How is that possibly relevant you go

11   to claims or get a lawyer?

12             MR. CANTOR:  You kept saying you sued for this

13   or that.

14             THE COURT:  That's the thrust of his -- I will

15   allow you to ask one or two questions about if an

16   employee believes he has a claim that can he do under the

17   Collective Bargaining Agreement.

18             MR. HICKEY:  It is not under the Collective

19   Bargaining Agreement.  It is not.  It is under the

20   statute.

21             THE COURT:  That's true.

22             MR. CANTOR:  He himself has gone up to claims

23   with people that are injured and try to resolve their

24   claims so he has personal knowledge of the system of the

25   method, this is how they resolve disputes at the

1    railroad.

2              MR. HICKEY:  Will I be able to put somebody on

3    from claims on how they tried to settle the claim but he

4    wants too much money?

5              MR. CANTOR:  We's not talking about the --

6              THE COURT:  Where is the disclosure of this

7    man's testimony that he was going to talk about this?

8              MR. CANTOR: Wage rates, benefits, lost earnings,

9    seniority, roster rules, common practice, safety

10   procedures.

11             The common practice when you were hurt on the

12   railroad, you go to claims and go and get a lawyer.  You

13   get a lawyer and sue because there's no workers

14   compensation.  You don't have a choice.  There's no

15   automatic system to resolve claims other than.

16             THE COURT:  I understand.  Tell me what your

17   objection is.

18             MR. HICKEY:  I don't understand, first of all,

19   why do we need this testimony.  He's going to say that

20   what?

21             THE COURT:  We have a man injured on the

22   railroad.  This is a union guy that deals with this type

23   of thing. He's going to say what he does.

24             I will allow you to ask one question about has

25   he been involved with the workers who have been injured

1    and what can -- what does a worker on the railroad do

2    when he's injured.  I expect the answer to be file a

3    claim or bring a lawsuit.

4                   (End of sidebar.)

5              THE COURT:  Sorry, ladies and gentlemen.

6         Q.  In your experience, has there been occasion

7    where workers who are injured have an option as to what

8    to do when they are injured on the railroad to resolve

9    their disputes?

10        A.  Yes.  For employee to recover wages, they either

11   deal directly with the risk management department on

12   their own or hire an attorney to represent them.  That's

13   the process.

14        Q.  In your capacity as a union official, are you

15   notified if employees are charged with violating any

16   company rules?

17        A.  Could you repeat that?

18        Q.  As a union official, if an employee is charged

19   with a rule violation, are you notified?  Is the union

20   notified?

21        A.  No, we are not notified.  We're made aware

22   there's charges.  We would represent the employee at the

23   hearing.  The employee is directly notified.

24        Q.  If there's an allegation of the rule violation,

25   then the union gets involved?

1        A.   That's correct.

2        Q.   And with respect to Mr. Piroscafo's incident of

3   February 23, 2008, are you aware of any charges against

4   Mr. Piroscafo for rules violations in connection with

5   that incident?

6        A.   No.   There were no rules -- no charges brought

7   for rules violations.

8             MR. CANTOR:   Thank you.

9             THE COURT:   Cross-examination.

10  CROSS-EXAMINATION BY MR. HICKEY:

11       Q.   Good afternoon, Mr. Bottalico.   Just want to

12  touch on a couple of points real quick and get you before

13  lunch.

14            This job that Mr. Piroscafo had paid $1766

15  approximately per week?

16       A.   Correct.

17       Q.   The 401K contribution would have come out of

18  that and he would have contributed if he wanted to?

19       A.   No.   Our 401 is strictly an employee

20  contribution.

21       Q.   So he would have made that contribution to the

22  401 not MetroNorth?

23       A.   That's correct.   MetroNorth payroll deducts it

24  and they send it to the Prudential.

25       Q.   Not an extra that he lost?

1    A.   It is a contribution he doesn't make.

2    Q.   He himself out of his money doesn't make?

3    A.   Doesn't make.

4    Q.   Understood.   1766 is a gross amount.  He, like

5    all of us, has to pay the tax man federal and state?

6    A.   Exactly.

7    Q.   Understood.   The train service manual that you

8    spoke about.   You are familiar with that?

9    A.   Yes, I am.

10    Q.   You talk about the conductor having to get out

11    on the platform to check to see the passengers.   Do you

12    remember that?

13    A.   Yes.

14    Q.   Is that required when there are two train men,

15    an assistant conductor and a conductor on a train?

16    A.   Yes.

17    Q.   When there's just a conductor, isn't it true

18    that the conductor can make that determination, look at

19    the platform through a window without getting off the

20    train?

21    A.   He could make that determination.   Usually -- it

22    is usually a -- it depends.   It depends on the location.

23    It depends on a lot of things.   I personally have opened

24    the doors and keyed the doors myself.   I have done that

25    in my career.   Depends on where I am.   What the

1      conditions are so I mean it is all relative to the

2      particular stop.

3           Q.  Are you familiar with the New Canaan branch?

4           A.  Somewhat.

5           Q.  Has it been a while?

6           A.  It's been a while, yes.

7           Q.  Springdale Station.  Do you remember that

8      station?

9           A.  Yes.

10          Q.  If a train comes up with just an engineer and

11     just a conductor on a Saturday morning, is there any

12     requirement that the conductor get off that train and on

13     to the platform?

14          MR. CANTOR:  I'm going to object to the

15     hypothetical.

16          MR. HICKEY:  It is not a hypothetical at all.

17          THE COURT:  If a train.  Aren't these facts,

18     though, in evidence?

19          MR. CANTOR:  I think for the jury to decide.

20          MR. HICKEY: Let me rephrase it.

21          Q.  Saturday morning, February 23, 2008.

22          A.  I was a lot younger.

23          Q.  Yes, so was I.

24          A.  I'm sorry.

25          Q.  That train that morning first train from New

1    Canaan to Stamford, there's one engineer and one

2    conductor I believe, correct?

3         A.   Yes.  They call that the dink.

4         Q.   The dink?

5         A.   The dink.

6         Q.   Three car train?

7         A.   Three cars, yes, conductor, engineer.

8         Q.   Is that conductor required to get out of that

9    train and on to the platform?

10        A.   By rule?

11        Q.   Right.

12        A.   No.  But it would be the conscientious thing to

13   do.  It depends on the conditions.  If it was beautiful

14   clear day, I would say no.  But it depends. Is there a

15   curve and no curve involved there?  It would be the

16   conscientious thing to do depending upon the conditions

17   is how I would answer that.  Fair enough.  A conductor

18   might have.  Most of the conductors we represent are

19   pretty conscientious so.

20        Q.   I'm sure they are.

21        A.   I thought I would add that.

22        Q.   I'm sure they are.  Because the job is actually

23   to look out for the passengers.  The job isn't to get off

24   the train.  It is to watch out for the passengers,

25   right?

1      A.   Well, I mean that's pretty vague.  To watch out

2   for the passengers sometimes you have to get off the

3   train.

4      Q.   I understand.  On a train like that, couldn't

5   the conductor go -- first of all, do you know how many

6   cars should have been opened that day?

7      A.   How many the train service manual recommended to

8   be open?

9      Q.   Right.

10      A.   To be honest with you, no.  If I saw the report,

11   I would know.  I don't remember how many cars they

12   specifically wanted open in 2008, no.

13      Q.   If, for instance, if there were two cars, would

14   the conductor open door in the panel and look towards to

15   see that everyone got on?

16      A.   Sure.  If there aren't a lot of people, the

17   conductor would key the door open.  Let the people on

18   rather than open all the doors.  It depends on the

19   situation.  How many people are boarding.  How many

20   people are detraining.

21      Q.   The conductor like Mr. Piroscafo comes up to the

22   station and see's there's half a dozen of people or less

23   getting on the train, nobody is getting off.  It is early

24   in the morning.  It is a short run.  He can key out the

25   door and stand in the door and watch whether people got

1    off or on.

2         A.   I think he would key the door and get out and

3    stand on the platform.  That would be a violation if he

4    stayed on the train.  If he's keying the door and letting

5    people on.

6         Q.   Watching people from the doorway, for instance,

7    or holding on to the train that wouldn't be a violation,

8    right?

9         A.   No.  But you should step out to the platform if

10   you are using the key.  Keying one door.  You want to

11   help people on and off.

12        Q.   You keep talking about depending on the

13   circumstances.  If they saw a circumstance there, for

14   instance, there was something on the ground they thought

15   could be a hazard, maybe a danger to the platform water,

16   ice, or snow, he could hold on to the train to protect

17   himself.  The safety rules would ask him to do that,

18   right?

19        A.   We're talking on the platform.  On the train

20   itself, yes.  On the platform, no.  There's nothing to

21   hold on to on the platform.

22        Q.   He could hold on to the train, right?

23        A.   What is he inspecting?  I'm trying to -- I don't

24   want to give the wrong answer.  If he's on the train and

25   there's a hazard on the particular train inside the car,

1   he would hold on to that railing.  If it is on the

2   platform and steps on to it, there's really nothing to

3   hold on to.  Maybe lean against the train.  You are not

4   allowed to do that.

5        Q.  Fair enough.  Once the passengers are on, he

6   then keys the door so that door can close and the

7   engineer can get power and leave?

8        A.  That's correct.

9             MR. HICKEY:  Thank you.

10            THE COURT:  Any redirect?

11            MR. CANTOR:  No, your Honor.

12            THE COURT:  You may step down, sir, you are

13   excused.

14            (End of excerpt.)

15

16

17


18   COURT REPORTER'S TRANSCRIPT CERTIFICATE

19   I hereby certify that the within and foregoing is a true

20   and correct transcript taken from the proceedings in the

21   above-entitled matter.

22

23   /s/  Terri Fidanza

24   Terri Fidanza, RPR

25   Official Court Reporter

# INDEX

**EXAMINATION**

| Witness Name | Page |
|---|---|
| Michael Hopkins | |
|    Direct By Mr. Cantor ........................................... | 2 |
|    Cross By Mr. Hickey ........................................... | 13 |
| ANTHONY BOTTALICO | |
|    Direct By Mr. Cantor ........................................... | 15 |
|    Cross By Mr. Hickey ........................................... | 33 |