```
1                   UNITED STATES DISTRICT COURT.

2                     DISTRICT OF CONNECTICUT

3    _____
     DANIEL PIROSCAFO             )
4                    Plaintiff.  )  NO: 3:08cv1753(JCH)
                                  )
5    vs.                          )  June 18, 2012
                                  )
6    METRO NORTH RAILROAD CO.     )
                     Defendant.   )
7    _____
                                      915 Lafayette Boulevard
8                                     Bridgeport, Connecticut

9                       EXCERPT OF TRIAL
            Testimony of Philip Wilhelmy and John Osmun
10

11   B E F O R E:
                     THE HONORABLE JANET C. HALL, U.S.D.J.
12                   And Jury

13   A P P E A R A N C E S:

14

15   FOR THE PLAINTIFF   :        Steven Lawrence Kantor
                                  Kantor & Godwin, PLLC
16                                5800 Main Street
                                  Williamsville, NY 14221

17                                Jeffrey M. Cooper
                                  Cooper Sevillano, LLC
18                                1087 Broad Street
                                  Bridgeport, CT 06604
19

20
     FOR THE DEFENDANT   :        Robert O. Hickey
21                                707 Summer Street
                                  Stamford, CT 06901
22

23   Court Reporter      :     Terri Fidanza, RPR

24

25
```

1              (Excerpt of trial.  Testimony of Philip Wilhelmy

2      and John Osmun.)

3              THE COURT:  Thank you very much.  Call the first

4      witness.

5              MR. CANTOR:  The plaintiff calls Phil Wilhelmy.

6              THE COURT:  Mr. Wilhelmy, if you would come up

7      here to the witness stand.  When you get up there, I ask

8      you to remain standing a few minutes.  The clerk is going

9      to administer an oath to you.

10              PHILIP   WILHELMY

11      Having been called as a witness, was first duly sworn and

12              testified on his/her oath as follows:

13              THE CLERK:  Please state your name, spell your

14      last name, city state of residence.

15              THE WITNESS:  Philip Wilhelmy, W-i-l-h-e-l-m-y.

16      Seymour, Connecticut.

17              THE COURT:  You may be seated.  Good afternoon

18      to you.  Whenever you are ready, Attorney Cantor.

19      DIRECT EXAMINATION BY MR. CANTOR:

20          Q.  Mr. Wilhelmy, can you tell the jury who you are

21      employed by?

22          A.  MetroNorth.

23          Q.  When did you begin working on the railroad?

24          A.  1986.

25          Q.  And have you worked there continuously since

1    1986 for MetroNorth?

2        A.  Yes.

3        Q.  Can you take us through the railroad job titles

4    that you held from 1986 up to the present and provide

5    approximate time frames and the names of the jobs?

6        A.  I started as a tower operator.  I moved on to a

7    rail traffic controller for several years.  I was asked

8    to be a train master in New Haven somewhere around 1999

9    and subsequently from that point about 2005 became

10   superintendent of operations out of New Haven.

11       Q.  Is that your current title?

12       A.  It is.

13       Q.  And did you also hold that title back in

14   February 2008?

15       A.  Yes.

16       Q.  Is that a management position?

17       A.  Yes.

18       Q.  Are you member of the union?

19       A.  I still pay my dues, yes.

20       Q.  And to what union is that?

21       A.  The Rail Traffic Controllers Union.

22       Q.  I would like to focus your attention on the time

23   period of February 23, 2008.  At that time you were

24   district superintendent of operations.  Can you tell us

25   what geographic area that covers?

1       A.   What's that?

2       Q.   What's the geographic area that you covered back

3   in February 2008 under your supervision?

4       A.   My district is New Haven, between New Haven and

5   Stamford.

6       Q.   About how many employees do you supervise?

7       A.   Ballpark about 500.

8       Q.   Can you tell us what your job duties and

9   responsibilities were as the District Superintendent Of

10  Operations?

11      A.   Responsible for the day-to-day operation of the

12  railroad.  All field activities, training the crew and

13  anything that happens out in the field, front line

14  supervision.

15      Q.   And in February of 2008, did you have a

16  particular office location you reported to work at?

17      A.   I reported to New Haven on that date.

18      Q.   Did you have a regular time that you reported to

19  work in February 2008?

20      A.   I'm responsible from -- well, I'm on 24/7, I'm

21  responsible three a.m. to three p.m. that time frame.

22      Q.   Were part of your job duties and

23  responsibilities to investigate employee on-the-job

24  injuries?

25      A.   Yes.

1         Q.   Do you know Daniel Piroscafo?

2              MR. HICKEY:   Can you repeat?

3         Q.   Were part of your job duties the responsibility

4    to investigate employee on-the-job injuries?

5         A.   Yes.

6         Q.   Do you know Daniel Piroscafo?

7         A.   Yes.

8         Q.   Do you recognize him here in the courtroom

9    today?

10        A.   Yes.

11        Q.   Can you show us where he's seated?

12        A.   Sitting there.

13             THE COURT:   The witness pointed to Mr.

14   Piroscafo.

15        Q.   Do you have an understanding as to what Mr.

16   Piroscafo's job title was on February 23, 2008?

17        A.   Yes.

18        Q.   What was it?

19        A.   Conductor.

20        Q.   And as the Conductor is Mr. Piroscafo part of

21   the transportation department which you supervise?

22        A.   Yes.

23        Q.   And is a Conductor one of many different crafts

24   at MetroNorth?

25        A.   Yes.

1    Q.   When we talk about crafts, can you explain to

2    the jury what some examples are of crafts on the

3    railroad?

4    A.   There's many, many crafts on the railroad from

5    construction to train crew operations.  Train crew

6    operations are engineers, conductors, assistant

7    conductors.  There's various crafts, electricians, car

8    cleaners, rail traffic controllers, maintainers.  It's a

9    varied list.

10   Q.   Does each craft have its own set of

11   supervision?

12   A.   Yes.

13   Q.   Does each craft have specific job duties and

14   responsibilities?

15   A.   Yes.

16   Q.   Does each craft have specific rules they follow

17   in that craft?

18   A.   Yes.

19   Q.   And, in general, do the rules of every craft

20   apply to every other craft or do they vary by craft?

21   A.   Specific tasks have specific rules but some

22   overlap.

23   Q.   As a supervisor in the Transportation

24   Department, were you required to be familiar with the

25   duties and responsibilities of the conductors?

1    A.   Yes.

2    Q.   Back in February 2008, did MetroNorth Railroad

3  have an onboard service manual that described the duties

4  and responsibilities of the conductors?

5    A.   Yes.

6    Q.   And are you familiar with that onboard service

7  manual?

8    A.   Yes.

9    Q.   Can you tell us what is your understanding of

10 the job duties and responsibilities of the conductors as

11 they existed in February 2008?

12   A.   The Conductor is responsible for the movement,

13 the safe movement of the train, the welfare of his

14 passengers, station work, onboard revenue and responsible

15 for an on-time train.

16   Q.   I would like to show you what's been marked as

17 Exhibit Number 24.

18        MR. CANTOR:   May I approach the witness?

19        THE COURT:   You may.

20   Q.   Can you take a look at Exhibit Number 24 and

21 tell me if you can identify it?

22   A.   It resembles a page in the train service, train

23 operations manual.

24   Q.   Does that include Rule 2001 duties and

25 responsibilities of train service employees.

1      A.   Yes.

2      Q.   The second part does it include Rule 2008, door

3  operation?

4      A.   Last page is 2008, yes.

5      Q.   Regarding Exhibit Number 24, is it a fair and

6  accurate copy of MetroNorth's Onboard Service Manual

7  describing the duties and responsibilities of the train

8  service employees under Rule 2001?

9      A.   Yes.

10      Q.   Also included in Exhibit 24, do we have a fair

11  and accurate copy of the MetroNorth's onboard service

12  manual for Rule 2008 door operation?

13      A.   Up to 2008B door operation on bombardier

14  equipment.  The rest of the manual is not here.

15          MR. CANTOR:  I would move Exhibit 24 into

16  evidence at this time.

17          MR. HICKEY:  I thought it was full already, your

18  Honor.

19          THE COURT:  It is.  24 is a full exhibit.  You

20  may proceed.

21      Q.   Is it fair to say that conductors have the

22  overall responsibility for safe operation of a train?

23      A.   Yes.

24      Q.   And is it a job duty and responsibility of the

25  Conductor to operate the doors at each station?

1    A.   Yes.

2    Q.   What is an assistant Conductor?

3    A.   Assistant Conductor performs the duties under

4    the guidance of the Conductor.   Revenue collection and

5    any duties that the Conductor assigns to them.

6    Q.   Are all train staff assistant Conductor?

7    A.   No.

8    Q.   If a train is not staffed with an assistant

9    Conductor who is there to perform the work of the

10   assistant Conductor?

11   A.   The Conductor would perform all the work.

12   Q.   Are you familiar with the railroad term key

13   out?

14   A.   I am.

15   Q.   Can you explain to the jury what your

16   understanding of key out is?

17   A.   Door operation panel cannot be energized once

18   the key is input in place.   The door operating panel or

19   that door where there's key out location.   In either

20   case, the key would control the door operation and limit

21   the engineer from taking power and moving the train.

22   Q.   Who performs the key out operation?

23   A.   The Conductor or whoever he designates.

24   Q.   And is it the job duty and responsibility of a

25   Conductor to designate a crew member for key out at the

1    stations?

2         A.   If it is available, yes.

3         Q.   What do you mean by if it is available?

4         A.   The Conductor will designate an assistant

5    Conductor if the assistant Conductor is available.

6         Q.   Or else he'll do it himself?

7         A.   Correct.

8         Q.   Are the required announcements made the duty and

9    responsibility of the Conductor?

10        A.   Yes.

11        Q.   Can you give the jury some examples of what is a

12   required announcement?

13        A.   It would be the trains overall designation, the

14   stop they are at, some general guidelines, watch the gap

15   as you exist the train.  General information like that.

16        Q.   I would like to refer you to Exhibit 24 in

17   evidence, 2001D priorities and duties.  Can you take a

18   look at that?

19        A.   2001D?

20        Q.   Yes.  Priorities and duties.

21        A.   Um-hum.

22        Q.   It states that the first priorities is always to

23   ensure the safety of our customers and fellow employees.

24   Would you agree with that?

25        A.   Yes.

1      Q.   That covers the customers and the employees on

2   the railroad, yes?

3      A.   Correct.

4      Q.   Exhibit 24 continues the second priority is the

5   comfort and convenience of the customers.  This includes

6   the making of announcements, providing sufficient seats

7   for all customers and otherwise dealing with the customer

8   service needs.  Do you agree with that?

9      A.   That's what it reads.

10      Q.   Do you agree with it?

11      A.   That's what it reads.

12      Q.   I want to refer you in Exhibit 24 to the second

13   part Rule 2008 door operation?

14      A.   Okay.

15      Q.   That rule speaks about a key up procedure number

16   five, does it not?

17      A.   Yes, it does.

18      Q.   That's the procedure you spoke to us earlier

19   about?

20      A.   Correct.

21      Q.   And it's the conductor's responsibility to place

22   key in the door in the key slot inside the car, turn to

23   the open position, leave it in place and step on the

24   platform and observe the loading and unloading of

25   customers under that procedure?

1      A.   That's not what I read, sir.

2      Q.   What do you read under key out procedures?

3      A.   The key out procedure will be performed by the

4   assistant Conductor designated by the Conductor.

5      Q.   If the assistant conductor isn't there, then the

6   conductor has perform the procedure?

7      A.   The Conductor will operate the doors and when

8   the Conductor operates the doors, it is the same feature

9   as the assistant Conductor does it at the key out

10  location.

11     Q.   Is either the assistant conduct or the Conductor

12  responsible to step out on the platform and observe the

13  loading and unloading of the customers?

14     A.   No.

15     Q.   And if they step out and they observe the

16  unloading and loading of customers, are they breaking any

17  rule?

18     A.   They are not breaking any rule, no.  They need

19  to observe the platform the rule states.

20     Q.   Does that sometimes required them to step out

21  based on your knowledge?

22     A.   They are instructed to and the rule states to

23  get the best physical advantage.

24     Q.   In your experience, have you ever opened

25  conductors step out?

1    A.   I have.

2    Q.   In your experience are you ever aware of any

3    Conductor that was charged with a rule violation for

4    stepping out to observe the safe boarding and unboarding

5    of passengers?

6    A.   I missed the first part.

7         THE COURT:  He asked to you repeat.

8    Q.   Did you ever observe a conductor who stepped out

9    to observe loading and unloading of passengers who were

10   charged with any rule violation for doing that?

11   A.   Most of the time the conductors do not step

12   out.

13   Q.   When's the last time you worked as an active

14   conductor?

15   A.   I was never an active Conductor.

16   Q.   Did you investigate Daniel Piroscafo's incident

17   of February 23, 2008?

18   A.   I did.

19   Q.   So we understand your experience, prior to

20   February 23, 2008, have you previously investigated

21   reports of employee incidents?

22   A.   Yes.

23   Q.   Can you use your best judgment in telling us how

24   many incidents you would have investigated prior to Mr.

25   Piroscafo's incident?

1      A.   Would have to be dozens.

2      Q.   When you have had occasion to investigate

3  employee incidents were they reported as on-the-job

4  injuries, did you have a regular procedure that you

5  followed?

6      A.   Yes.

7      Q.   Can you tell the jury what that procedure

8  consisted of?

9      A.   There's an initial page report that's called the

10  initial report about the incident, general information,

11  get into the chief's ROTC office right away in case

12  there's a condition or problem going on, then there's a

13  full investigative report to follow.

14      Q.   Anything else as far as what you do as your

15  procedure?

16      A.   I do the investigation.

17      Q.   And the investigation consists of the two pieces

18  of paper work you described, correct?

19      A.   Correct.

20      Q.   What else, if anything?

21      A.   General information.

22      MR. HICKEY:   Can you repeat what you said?

23      A.   General information.

24      Q.   What do you mean by general information?

25      A.   Any information pertaining to the cause, the

1    nature of the accident, as much information as I can

2    gather.  Witnesses, other people involved.

3        Q.  And regarding the paperwork that you are

4    required to prepare, is it important to be accurate?

5        A.  Yes.

6        Q.  And do you know if people other than yourself

7    would be reviewing the paperwork and relying on what you

8    reported?

9        A.  Correct, yes, there is.

10       Q.  Did you follow your regular procedure that you

11   described to us in investigating Mr. Piroscafo's

12   incident?

13       A.  Yes, I did.

14       Q.  With respect to Mr. Piroscafo's accident of

15   February 23, 2008, did you witness the incident?

16       A.  No, I didn't.

17       Q.  Can you tell us how you first gained knowledge

18   of the incident?

19       A.  I was paged by the chief rail traffic controller

20   that an employee had claimed an injury at Stamford off

21   the New Canaan train.

22       Q.  And let's tell the jury what's the rail traffic

23   controller?

24       A.  Like an air traffic controller, they do it with

25   the trains.  There's a chief that oversees the office.

1     Q.  You had a conversation with a rail traffic

2   controller.  Do you recall who it was?

3     A.  I don't remember.

4     Q.  Did you ask the rail traffic controller if they

5   requested the track department to get on the Springdale

6   platform?

7     A.  I spoke with the chief.  After ascertaining what

8   the problem was, what actually happened, we had the track

9   department to go back out to Springdale and check the

10   platforms.

11     Q.  Now tell me is a track man a different craft

12   we're talking about as far as a Conductor?

13     A.  Yes.

14     Q.  What is your understanding of what the tracking

15   job duties and responsibilities are?

16     A.  They maintain the tracks.

17     Q.  Does that include platforms?

18     A.  There's other duties.  One of them is to address

19   some of the platforms, not all of the platform.

20     Q.  How about the platforms at Springdale?

21     A.  Springdale is a MetroNorth maintained

22   platform.

23     Q.  Now when you received information from the rail

24   traffic controller that there was an incident with Mr.

25   Piroscafo, what did you do?

1        A.   I immediately drove to Stamford and tried to

2   find Mr. Piroscafo.

3        Q.   And did you find him?

4        A.   Yes.

5        Q.   Where was he?

6        A.   Stamford Hospital.

7        Q.   Do you know how long he was at Stamford Hospital

8   prior to your finding him?

9        A.   Not exactly, no.

10        Q.   Was anyone else there from the railroad when you

11   arrived?

12        A.   Not that I remember.

13        Q.   When you arrived at the Stamford Hospital, did

14   you have the responsibility to observe Mr. Piroscafo?

15        A.   Yes.

16        Q.   And from your observation, could you determine

17   if he had sustained an injury to any part of his body?

18        A.   He had injury to his foot.

19        Q.   And based upon your observation, did he appear

20   to be any pain or discomfort?

21        A.   Yes.

22        Q.   Can you describe for me what your understanding

23   of the pain and discomfort?

24        A.   It hurt.

25        Q.   Were you aware as to whether or not he had been

1    administered any medication prior to your arriving at

2    Stamford Hospital?

3         A.   I believe he was given a prescription.

4         Q.   Do you know what the prescription was?

5         A.   I don't recall.

6         Q.   And do you know how long prior to your arrival

7    he was given that?

8         A.   I don't.

9         Q.   I want to show you what's been marked as

10   Plaintiff's Exhibit 1 for identification.

11             MR. CANTOR:  May I approach?

12             THE COURT:  You may.

13        Q.   I would like you to take a look at that and tell

14   me if you can identify it for the record.

15        A.   That's the initial reported incident.

16        Q.   And is this a document that you prepared in the

17   regular course of business?

18        A.   Yes.

19        Q.   And that's part of your job duties and

20   responsibilities at MetroNorth to prepare that

21   document?

22        A.   Yes.

23        Q.   And does your handwriting appear on that

24   document?

25        A.   Yes.

1    Q.  Your Honor, I would move Exhibit 1 into

2    evidence.  I would also request permission to publish to

3    the jury on the overhead.

4         THE COURT:  You may do so.  It is already in

5    evidence as far as I understand.  Is that your

6    understanding, Attorney Hickey?

7         MR. HICKEY:  Yes, your Honor.  No objection.

8    Q.  Everybody see that okay?  Can you explain to the

9    jury what Exhibit Number 1 is?

10   A.  Initial report of incident.  It is a document

11   getting the general information down to the chief rail

12   traffic controller's office to get the information out

13   about what happened.

14   Q.  Does it indicate the date and time of Mr.

15   Piroscafo's incident?

16   A.  Yes.

17   Q.  What time is it?

18   A.  Date and time reported was 6:40 a.m.

19   Q.  On what date?

20   A.  February 23, 2008.

21   Q.  And when was it reported?

22   A.  It was reported approximately the same time.

23   Q.  Under this section entitled Brief Description of

24   the Incident, can you tell us what you wrote?

25   A.  Employee states stepped off train 6705 at

1    Springdale to do station work, slipped on icy platform

2    and fell to the ground injuring right foot.

3        Q.   Are you familiar with the Springdale station

4    platform?

5        A.   Yes.

6        Q.   Is it an elevated platform?

7        A.   Yes.

8        Q.   There's a reference in Exhibit 1 to train 6705.

9    What does that mean?

10       A.   That's the train number.

11       Q.   And it states under the brief description in red

12   to do station work.  Do you have an understanding what to

13   do station work is?

14       A.   The employee stated he was doing station work.

15   That's boarding and loading and unloading passengers.

16       Q.   Is that part of his job duties and

17   responsibilities?

18       A.   Yes.

19       Q.   Is it fair to say that the station work Mr.

20   Piroscafo was performing was stepping out onto the

21   platform and observing the loading and unloading of

22   passengers?

23       A.   That's what he stated.

24       Q.   What was the condition of the platform?

25       A.   I didn't see the platform.

1          Q.  Exhibit 1 contains a description of the injury

2     and disposition.  What did you write?

3          A.  He was transported to Stamford Hospital by EMS.

4     Possible broken toe.

5          Q.  I want to go back to Exhibit Number 24 here, and

6     I want to show that back to you again.  Can everybody

7     hear if I speak.  Is that okay?

8               THE COURT:  It is but you should turn.

9          Q.  Exhibit 24, Rule 2008, door operation, Section

10    2008, a door operation on M series cars.  Do you see

11    that?

12         A.  I do.

13         Q.  Was the train involved here was it an M series

14    car?

15         A.  Yes.

16         Q.  With respect to the key out procedure, can you

17    read the paragraph that I'm referencing here, paragraph 2

18    under number 5?

19         A.  When the train is stopped at the station, the

20    crew member will place a door key in the key slot inside

21    the car.  Turn it to the open position, leaving the key

22    in place, step onto the platform and observe loading and

23    unloading of customers.

24         Q.  So the rule states that the conductor will step

25    on to the platform to observe the loading and unloading?

1          A.   Negative.

2          Q.   Why do you stay it doesn't say that?

3          A.   Because like I stated before, this is for an

4     assistant conductor.  Mr. Piroscafo at the time was the

5     conductor, and he should have been at the door panel

6     operating the doors inside the train.

7          Q.   So when there's no assistant conductor, the

8     conductor is not responsible to step out and observe the

9     loading and unloading.  Is what you are telling the jury,

10    correct?

11         A.   It is unnecessary.

12         Q.   And the platform in Springdale that Mr.

13    Piroscafo allegedly slipped on, that's maintained by

14    MetroNorth's track unit, correct?

15         A.   Snow removal and surface condition is the

16    responsibility of the track department, yes.

17         Q.   I would like to show you Exhibit Number 2.  May

18    I, Judge?

19              THE COURT:  You may.  You don't have to do this.

20    It is already in evidence.

21              MR. CANTOR:  I want to question him about it.

22              THE COURT:  That's fine, then you do need to do

23    this.

24         Q.   Can you identify Exhibit 2 for the jury?

25         A.   Yes.  That's the investigation report, incident

1      investigation report.  It is called a IT2.  Comes after

2      the initial report of incident.

3          Q.  And is that a document that you regularly

4      prepare in the course of your job duties as a supervisor

5      for MetroNorth?

6          A.  Yes.

7          Q.  And you are familiar with this document?

8          A.  I am.

9          Q.  It is already in evidence, correct, your

10     Honor?

11             THE COURT:  Well, this one we had a question

12     about.  I don't know if you resolved that with counsel or

13     not.

14             MR. CANTOR:  I'm not aware of any question

15     regarding it.

16             THE COURT:  I'm sorry.  That was withdrawn.  I

17     apologize.  I know we talked about it.  I had to refresh

18     myself.  You may publish it.  Correct, Attorney Hickey?

19             MR. HICKEY:  Yes.

20         Q.  Does your signature appear on Exhibit 2?

21         A.  Yes, sir.

22         Q.  The report was also approved by a John

23     Longobardi?

24         A.  That's correct.

25         Q.  Who is Mr. Longobardi?

1        A.   He's a line superintendent.

2        Q.   Is he above you or below you?

3        A.   Above me.

4        Q.   Does the report request how the incident

5   occurred including relevant events dating up to the

6   incident?

7        A.   Yes.

8        Q.   And can you tell us what you put there?

9        A.   What section would you like to know?

10       Q.   Describe how the incident occurred?

11       A.   Train 6705 stopped at the Springdale station,

12   employee keyed out, stepped on the platform feet came out

13   from under him, employee states platform covered with

14   snow and ice, injured right foot from fall.

15       Q.   I would like to refer you to page 2.

16       A.   Okay.

17       Q.   Now it states that Mr. Piroscafo was assigned

18   tour of duty C207.  Can you explain to the jury what that

19   designation is?

20       A.   Conductor run 207.

21       Q.   Is that a specific job assignment?

22       A.   It is.

23       Q.   Is there a particular pay rate that's assigned

24   to that job assignment?

25       A.   I believe so, yes.

1      Q.   On the bottom of page 2, it says briefing and

2   instructions.   Did employee receive any relevant job

3   safety briefing instructions or warnings prior to the

4   incident?   If so, who delivered them and describe the

5   content.   What did you put down on Exhibit 2?

6      A.   None.

7      Q.   I would like to refer you to page 4 of Exhibit

8   2.

9      A.   Okay.

10      Q.   Under weather and site conditions, it states

11   describe any conditions as the incident site relevant to

12   the investigation.   What did you put down there?

13      A.   Snow and ice residual from overnight winter

14   storm.   On off precipitation below freezing

15   temperatures.

16      Q.   Above that it states there was a MTA Police

17   Officer T. Headman.   Do you know who that is?

18      A.   I do.

19      Q.   Did you speak with Mr. Headman at all?

20      A.   I did.

21      Q.   It states that there's a Michael Hopkins.   Do

22   you know who he was?

23      A.   I believe he's the witness that assisted Mr.

24   Piroscafo to get back up.

25      Q.   Did you speak the him?

1          A.  I did not.

2          Q.  And then it states M. A. Erick or Elrick, do you

3     know who he was?

4          A.  He was the engineer on the job.

5          Q.  Did you speak to him at all?

6          A.  I did not.

7          Q.  You did not speak to Mr. Hopkins or Mr. Erick as

8     part of your investigation, correct?

9          A.  Correct.

10         Q.  Are you aware of anyone at MetroNorth who did

11    speak to Mr. Erick?

12         A.  No.

13         Q.  Are you aware of anyone at MetroNorth that spoke

14    to Mr. Hopkins?

15         A.  No.

16         Q.  Do you know whether or not on February 23, 2008,

17    Mr. Piroscafo was wearing appropriate footwear?

18         A.  I believe he was.

19         Q.  And, in fact, it says so in the report Exhibit

20    2, correct?

21         A.  Yes.

22         Q.  I would like to refer you to page 5 of that

23    exhibit.

24         A.  Okay.

25         Q.  Describe to the jury what page 5 is.

1        A.   Page 5 is a record of a statement or interview

2   either written or verbal from Mr. Piroscafo.

3        Q.   And is that something that Mr. Piroscafo told

4   you word for word and you reported it down or what was

5   the process of you recording that statement?

6        A.   I talked to him and wrote down what he said.

7        Q.   Is it his words or a summary of your

8   understanding of his words?

9        A.   It is a record of an interview.

10       Q.   Can you tell us what it says in the record?

11       A.   Employee stated he arrived at Springdale station

12  on train 6705.  The train had three cars.  He at the time

13  only had one car opened, the west car, 8935.  He was at

14  the west vestibule.  The engineer opened the doors.  The

15  employee keyed out.  The employee states he announced

16  watch your stop.  The employee states he may or may not

17  have added slippery conditions on the platform to his

18  announcement to the customers.  Employee states he exited

19  the train to observe the platform for customers at the

20  other end of the car, stepped on the platform and

21  immediately fell to the ground.  He states his feet came

22  out from under him as if he had no control.  The employee

23  states he was helped up from the ground by customers and

24  helped back on the train.  Employee states no customers

25  fell.  Employee states pain and swelling increased. He

1    called the ROTC, was met at the Stamford station by the

2    MTA Police Department and transported to Stamford

3    Hospital.

4        Q.   Train 6705 was that a regularly scheduled train

5    that arrived at Springdale station on February 23, 2008?

6        A.   Yes.

7        Q.   Exhibit 2 indicates Mr. Piroscafo announced

8    watch your step, and he may or may not have added

9    slippery conditions on the platform to his announcement,

10   correct?

11       A.   Correct.

12       Q.   And he's required to make those announcements as

13   one of his job duties and responsibilities under Rule

14   2001, isn't he?

15       A.   Making announcements as part of his duties,

16   yes.

17       Q.   Do you know an individual named Ron O'Connor?

18       A.   I do.

19       Q.   Do you have an understanding as to what craft

20   Mr. O'Connor was involved in as of February 28?

21       A.   Supervisor for the track department.

22       Q.   Track department has different duties and

23   responsibilities than your department, the transportation

24   department, correct?

25       A.   Yes.

1      Q.   One of those duties includes inspecting station

2  platforms for ice and snow?

3      A.   They address the platform for ice and snow.

4      Q.   They also apply sand or salt?

5      A.   Yes.

6      Q.   After this accident, did you speak with

7  Mr. O'Connor at all regarding the condition of the

8  Springdale station platform?

9      A.   I recall I told him about if they went back to

10  do the platforms to check it.

11      Q.   During your investigation on Exhibit 2, did you

12  conclude that ice on the platform was a contributing

13  factor?

14      A.   I did not.

15      Q.   Under cause on Exhibit 2, employee failed to

16  that adjust for known snow and ice.  So you knew there

17  was snow and ice on the platform, correct?

18      A.   I didn't know it.

19      Q.   But there was snow and ice on the platform as

20  reported by Mr. Piroscafo?

21      A.   I can't say.  I wasn't there.

22      Q.   And the track department was to try and start

23  snow removal earlier in the next snow event was what you

24  put on the report, correct?

25      A.   That's what I put on the report.

1          Q.   I would like to show you now what's been marked

2     for identification or marked in the evidence as Exhibit

3     3.  Can you identify that exhibit for the record?

4          A.   It is a letter from Management of Absence

5     Control to Mr. Piroscafo.

6          Q.   And what is Absence Control?

7          A.   Absent Control is they are a department of the

8     crew management system and they control -- they work on

9     managing lost time and especially people getting injured

10    and where they are supposed to be, things of that

11    nature.

12         Q.   Are you CC'd on this particular letter?

13         A.   I am.

14         Q.   Is it a document that's prepared by MetroNorth

15    in the regular course of business?

16         A.   Yes.

17         Q.   And are you familiar with Exhibit 3?

18         A.   Yes.

19         Q.   Your Honor, I would like to move that into

20    evidence please.

21              THE COURT:  If there isn't any objection, it is

22    in evidence.

23         Q.   Robin Brown did you speak with her at all

24    regarding this incident?

25         A.   I don't remember.

1      Q.   There's an S. Harrington who is copied, who is

2   she?

3      A.   That would be the director of operations.

4   Excuse me.  Assistant vice president of operations.

5      Q.   And there's M. Badur, B-a-d-u-r --

6      A.   Badrena.

7      Q.   Do you know who that person is?

8      A.   I do.

9      Q.   Who is that?

10      A.   She was in purchase control.

11      Q.   And there's a C. Donaldson.

12      A.   He's crew management.  He's in charge of crew

13   management.

14      Q.   J.  Kanap?

15      A.   He was a line superintendent.

16      Q.   And then yourself is on there, correct?

17      A.   Yes.

18      Q.   Also operational health services is listed on

19   there as getting CC'd.  Do you have an understanding as

20   to who that is?

21      A.   I do.

22      Q.   Can you tell us?

23      A.   Operational health services, OHS, is our medical

24   department.  Health services in the medical department of

25   MetroNorth?

1    Q.  So MetroNorth keeps track of their employees'

2    health, correct?

3    A.  Yes.

4    Q.  Is it fair to say that Exhibit 3 indicates if

5    Mr. Piroscafo fails to attend an appointment with the

6    medical department it could result in disciplinary action

7    to him?

8    A.  He's required to follow the direction of OHS,

9    yes.

10   Q.  To your knowledge are MetroNorth employees who

11   are injured, regularly examined by MetroNorth's medical

12   department?

13   A.  Yes.

14   Q.  And to your knowledge does the injured employee

15   also have his or her own physician send medical reports

16   to the --

17   A.  I believe so.

18   Q.  I want to show you Exhibit 4.  Can you tell me

19   if you are familiar with that document?

20   A.  Yes.

21   Q.  Does your handwriting appear on it?

22   A.  Yes.

23   Q.  Does your signature appear on it?

24   A.  Yes.

25   Q.  Is that a document that you prepared for

1    MetroNorth in the regular course of your business as a

2    supervisor?

3         A.   Yes.

4         Q.   I would move that Exhibit 4 be admitted.

5              THE COURT:   It is a full exhibit.

6         Q.   Is it fair to say that Exhibit 4 is a written

7    summary of discussion you had with Mr. Piroscafo?

8         A.   Yes.

9         Q.   And Exhibit 4 indicates that you advised him as

10   to an individual safety improvement plan.  Can you tell

11   the jury what was the individual safety improvement plan

12   that you had for Mr. Piroscafo?

13        A.   We talked about in the month of February in New

14   England, we should expect slippery conditions at times.

15        Q.   So you put down expect slippery conditions as

16   your personal improvement safety plan, correct?

17        A.   As Mr. Piroscafo's.

18        Q.   Is it fair to say that MetroNorth railroad

19   employees should expect slippery conditions at all

20   times?

21        A.   They should always be prepared, yes.

22             MR. CANTOR:   That's all I have for this witness

23   on direct.

24             THE COURT:   Cross-examination, Attorney

25   Hickey.

1          MR. HICKEY:  Thank you, your Honor.

2     CROSS-EXAMINATION BY MR. HICKEY:

3          Q.  Mr. Wilhelmy, I would like to back up just a

4     little and cover a couple of topics that Mr. Cantor

5     covered with you.  First of all, you said there are a set

6     of rules for the transportation department; is that

7     right?

8          A.  Yes.

9          Q.  And, I'm sorry, various crafts that have rules

10    that would pertain only to them?

11         A.  Some of the rules would be specific to crafts

12    and some rules general safety instructions would be for

13    all crafts.

14         Q.  When you say the general safety instructions,

15    what is that?

16         A.  There's a set of general safety instructions

17    that are part of the train crews necessary equipment that

18    they must carry with them at all times.

19         Q.  Is it actually a published book of safety rules

20    that each employee gets?

21         A.  Safety instructions, yes.

22         Q.  Did you say they have to carry them with them at

23    all times?

24         A.  Yes.

25         Q.  Would that apply to conductors and engineers or

 1   is that everybody on the railroad?

 2        A.   The requirement for carrying is for train crews

 3   but the general safety instructions everyone should be

 4   qualified on.

 5        Q.   Do they apply to everybody?

 6        A.   Yes.

 7        Q.   Even the president of the railroad down to

 8   person who was just hired yesterday, they apply to

 9   everybody?

10        A.   Yes, they do.

11        Q.   You, in 2008, were very familiar with the job

12   responsibilities of the conductors?

13        A.   Yes.

14        Q.   There was a little bit of talk, it went pretty

15   quickly so I want to break it down. The Conductor and

16   assistant Conductor is there a difference?

17        A.   Yes.

18        Q.   What is the difference between a Conductor and a

19   assistant Conductor?

20        A.   The Conductor is in charge of the safe movement

21   of the train.  He's the boss on the train.  He's in

22   charge.  He gives direction to the rest of the train crew

23   which may or may not include an assistant Conductor and

24   the engineer.

25        Q.   Now the engineer actually drives the train?

1       A.   They operate the train.

2       Q.   They operate the train, okay.  It is the

3   Conductor who has the responsibility, the overall

4   responsibility for that train?

5       A.   Yes.

6       Q.   Are there always a Conductor and assistant

7   conductor on a given train?

8       A.   No.  There's general operating practices when

9   there's a single crew member just a Conductor and another

10  set of operating procedures and directions when there is

11  an assistant conductor.

12      Q.   For Mr. Piroscafo on the morning that this

13  incident occurred, do you know if he was working as a

14  sole Conductor or whether he had an assistant Conductor?

15      A.   Soul Conductor.

16      Q.   You talked before about the process of keying

17  out.  That's new a term I'm sure for the jury.  Can you

18  refresh the jury's understanding of what keying out

19  means?

20      A.   When there's more than one Conductor -- when

21  there's an assistant Conductor assigned with the

22  Conductor, the Conductor will assign the assistant

23  Conductor to position himself on the train to key out.

24  That would most likely be at a point where farthest away

25  from the conductor's spot so that they can take advantage

1    of looking at the train as a whole.  This particular

2    train did not have an assistant Conductor and only three

3    cars long.

4         Q.  But just the term keying out.  What physically

5    does a Conductor do to key out?

6         A.  He puts the train key into the panel or into the

7    door and turns the key, that key takes the power away

8    from one door and the ability for the engineer to take

9    power so that the train -- it is a safety feature and the

10   train can't be moved.

11        Q.  So the Conductor keys out the door when it's

12   stopped at a station and not only can that door not close

13   but the train can't get power to leave?

14        A.  That's correct.

15        Q.  The Conductor that keys out, when does he key

16   back in so to speak?

17        A.  The assistant Conductor on two-member crew or

18   more than two-member crew, the Conductor would be at the

19   door operating the panel looking out the window.  The

20   assistant Conductor would be at another point on the

21   train with a key in the door.  When all the station work

22   is completed, the conductor while he's looking out, will

23   close the doors.  All the doors will close except for the

24   door that the assistant conductor is keyed out on.  At

25   that point, he'll check the platform and close the

1  door.

2      Q.  I don't want to over-simplify this, but let's

3  give the jury a sense of why one train might need a

4  conductor and an assistant Conductor as far as the amount

5  of train cars.  What's a big size train that MetroNorth

6  might run?

7      A.  The smallest train we used to run was a two-car

8  train.  Now it is usually a three-car train.  Simply

9  speaking they add an assistant Conductor, the larger the

10  train, the more people, the more assistant conductors are

11  added.

12      Q.  How many cars could there be on a train?

13      A.  We run 10 to 12 cars maximum.

14      Q.  So the jury can get a sense of the two man

15  operation, you would have the assistant Conductor

16  hopefully at one end of the train and the Conductor at

17  the other end so they could correspond to each other and

18  make sure everything is safe before they leave.  Is that

19  the general sense?

20      A.  That's the general idea.

21      Q.  And the key out portion of that is the safety

22  feature so nobody gets caught getting on or off?

23      A.  To observe the platform to make sure everybody

24  that's intending to get on gets on.  Before they start

25  moving again, people are aware from the train.  That

1    space right next to the platform where the train is

2    that's clear of people.

3         Q.  You talked about Rule 2008 in the keying in and

4    out.  You read a paragraph.  I would like to put that

5    back.

6              THE COURT:  Just so you identify what exhibit is

7    up there.  I think that's Exhibit 24 in a particular

8    section.

9              MR. HICKEY:  Exhibit 24, thank you, your

10   Honor.

11             THE COURT:  Which section are we looking at?

12             MR. HICKEY:  Paragraph 5.

13        Q.  I believe Mr. Cantor had you read the second

14   paragraph.  That second paragraph that you read it does

15   indicate that the assistant Conductor will step on to the

16   platform; isn't that true?

17        A.  Yes.

18        Q.  But what about the first paragraph?  Can you

19   read that into the record?

20        A.  On trains operating with one or more assistant

21   conductors, the Conductor will designate one person to

22   key out at each station.

23        Q.  That rule applies to when you have more than one

24   conductor.  You have a Conductor and assistant Conductor?

25        A.  Yes.

1      Q.  Do you happen to know from your investigation

2  the morning of this incident with Mr. Piroscafo, did he

3  have an assistant Conductor?

4      A.  No, he did not.

5      Q.  Does that rule apply to what he was doing that

6  morning?

7      A.  No.

8      Q.  Certainly Mr. Piroscafo must have had

9  responsibilities for observing the platform and making

10  sure the passengers got on, correct?

11      A.  Yes.

12      Q.  What were Mr. Piroscafo's responsibilities that

13  morning as a single Conductor on that train car?  What

14  were his responsibilities?

15      A.  His responsibilities for the safe movement of

16  the train, the safety of his passengers and to operate

17  the doors at the stations.

18      Q.  What is your understanding that morning of how

19  many train cars at the platform actually opened up to

20  allow passengers to get on the train?

21      A.  Only one.

22      Q.  So this is not a situation where we talked about

23  before where there's a Conductor and assistant Conductor

24  looking over many cars.  This is one single car with

25  passengers getting on and off?

1    A.   Correct.

2    Q.   From where did Mr. Piroscafo observe the

3  passengers getting on and off that train car that

4  morning?

5    A.   He should do it from the door panel out the

6  window.

7    Q.   And I'm thinking about the old movies literally

8  where the Conductor is sticking his head out the window,

9  looking down the platform as the platform leaves.   Is

10  that what we're talking about?

11    A.   That's correct.

12    Q.   In the normal course of business, don't a lot of

13  conductors step out the door or get in that doorway to

14  make those observation as to people getting on or off?

15    A.   Mostly the Conductor does not step out on to the

16  platform.

17    Q.   How do they do it?  On this particular car, how

18  would he look to see if people are getting on and off?

19    A.   The engineers in the leading end of the train

20  and the next door panel would be the second car that

21  should have been opened.  The Conductor would slide the

22  window down, key in the panel, open the doors, observe

23  the platform and then make sure that everybody is on and

24  off.  From that point, he's to observe the platform until

25  the train clears the platform.  If the Conductor is not

1    able to do that, he steps out on to the platform, steps

2    back in and closes the doors.  He can't observe the

3    platform that way.

4         Q.  You said earlier that Mr. Piroscafo wouldn't be

5    charged with discipline or violating the rule if he had

6    chosen to do it at the doorway, right?

7         A.  I think the question was is he not allowed to

8    step onto the platform.  There's no specific rule that

9    says he can't but if he was to operating the train the

10    way he was supposed to, there's no reason to do it.  He's

11    not supposed to do it.

12         Q.  Let me ask you this: if the train comes to the

13    platform and Mr. Piroscafo opts to use the door as the

14    location so he can watch whether people are still getting

15    on or off, is there a way for him to use the doorway as

16    opposed to the window and still not go out on the

17    platform?

18         A.  In this particular case, yes, you have the

19    engineer operate the doors.  He puts the key into the

20    panel, the key out procedure and stepped out on to the

21    platform.

22         Q.  But to observe, for instance, could he keep one

23    foot inside the train and one foot outside the train?

24         A.  Absolutely.  All he has to do is observe the

25    platform.  He can hold on to the train and look left and

1   look right and clear the platform, then close the door.

2       Q.   Did you say he can hold on to the train?

3       A.   Yes, there's a handrail.  Grab iron handrail

4   that's there.

5       Q.   Why would there be a grab iron or handrail there

6   if it is at the platform?

7       A.   In that door, there's a ladder for trains in the

8   yard to climb up on to the train.  It's under the

9   platform height but at waist height, there's a grab iron.

10  He could hold the grab iron, look out the door and step

11  back on to the train.

12      Q.   I want you to assume hypothetically that that a

13  Conductor who is working on the train such as that one

14  that morning, actually observed something on the platform

15  that makes them concerned, whatever it is water, ice,

16  snow, any rule that would make them walk out on to the

17  platform?

18      A.   No.  Not a single person train, he should not

19  have walked out on to the platform.

20      Q.   Is there a safety rule that directs a Conductor

21  how to proceed when they perceive something that could be

22  a hazard?

23      A.   There's a couple that apply, yes.

24      Q.   In the overall sense of things safety on the

25  railroad, is there any guiding rule that the railroad

1    employees are instructed on as to the course of action to

2    take?

3         A.   The nature of the railroad is, you know, along

4    the track, there's ballasts, there's always a sense of

5    watching your step.  If, in doubt, take the safe course,

6    adjust for conditions.  Those are all stated in the

7    generally safety instructions.

8         Q.   Are you familiar with the Safety Rule 300.5?

9         A.   Yes.

10        Q.   I would like to use the machine here.  This is

11   Defendant's Exhibit 202?

12             THE COURT:  Why don't we take that up after

13   lunch.  Ladies and gentlemen, I would excuse you until

14   2:00, remind you not to talk about the case with anyone.

15   You don't have to stay in the jury room.  You are free to

16   go outside.  There's a few places close, not many,

17   there's some places you can get something and a snack bar

18   downstairs as well.  We'll see you back at 2:00.  Thank

19   you very much.

20             (In the absence of the jury at 01:13 p.m.)

21             THE COURT:  You may step down.  We need you back

22   in the seat a few minutes before 2:00.  Counsel, is there

23   anything we need to take up that would delay us getting

24   back at 2?  I have a point of information where is the

25   Springdale station?

1              MR. HICKEY:  Stamford.

2              THE COURT:  Is that the main Stamford station.

3              MR. HICKEY:  This is known as the branch line.

4              THE COURT:  Going north.  It is out of Stamford

5     as you head to New Canaan, you will hit this one?

6              MR. HICKEY:  Exactly.

7              THE COURT:  I just wondered.  We'll see you all

8     back a few minutes before two.

9              (Whereupon, a recess was taken from 01:14 p.m.

10    to 02:02 p.m.)

11             THE COURT:  We're all set to bring the jury back

12    out.  Sir, you can come back to the witness stand.

13    Attorney Hickey, you were up at the podium and ready to

14    go with an exhibit.

15                  (02:04 PM in the presence of the jury)

16             THE COURT:  Welcome back, ladies and gentlemen.

17    Everybody be seated.  The jury is in the box, counsel are

18    in the courtroom and the witness is in the witness box.

19    BY MR. HICKEY:

20       Q.  Mr. Wilhelmy, right before the lunch break, we

21    talked about safety rule 300.5.  What is rule 300.5?

22       A.  300.5 is a slip, trip and fall hazards.

23       Q.  Is this rule published in that rule book that we

24    talked about earlier?

25       A.  Yes.

1      Q.   Is it published to all of the employees?

2      A.   Yes.

3      Q.   Defendant's Exhibit 202 is on the screen, your

4  Honor, in the lower right hand corner.  I will go to the

5  second page and go to the one particular spot.

6           Mr. Wilhelmy, are you familiar with the 10th

7  bullet point?  It is the last point before we get to Rule

8  300.6.  Are you familiar with that portion of the rule

9  300.5?  For the record, if you can read into the record

10  what that last bullet point says?

11      A.   Be alert to walking conditions.  Adjust your

12  gait and activities to accommodate weather, lighting,

13  grade and surface conditions.

14      Q.   Can you give the jury a sense in practice what

15  that rule means as far as conductors?

16      A.    In the simplest term, you need to watch where

17  you are walking.  The railroad is filled with uneven

18  surfaces and conditions.  We have to be alert and adjust

19  to that at all times.

20      Q.    If the conductor such as Mr. Piroscafo on the

21  morning of the incident saw anything on the platform,

22  perhaps there had some damage to the platform by a train,

23  something like that, the passenger left something on the

24  platform, how would this rule apply?

25      A.    He would need to make adjustments for the

1  conditions that face him and protect against harm.

2      Q.  Does this rule, the safety rule, does that trump

3  any other rule as far as what he should do when faced

4  with a particular situation that he perceived or should

5  perceive to be hazardous or anything else?

6      A.  Absolutely.

7      Q.  Now you testified earlier that you went to the

8  Stamford Hospital and picked up Mr. Piroscafo after the

9  incident; is that right?

10     A.  Yes.

11     Q.  Did you give him a ride from the Stamford

12  Hospital back to Stamford MetroNorth facility?

13     A.  Yes.

14     Q.  Did he talk to you while you were on that car

15  trip?

16     A.  Yes.

17     Q.  And did they indicate anything to you as to

18  whether he had recognized that there was a potential

19  slippery condition before he stepped outside the train?

20         MR. CANTOR:  Objection to the hearsay.

21         THE COURT:  Do you claim it, sir?

22         MR. HICKEY:  Yes.

23         THE COURT:  Did you say they indicate or he?

24         MR. HICKEY:  I should have said he.

25         THE COURT:  Isn't it a statement by a party

1    opponent?

2         MR. COOPER:  For the plaintiff, yes.

3         THE COURT:  If you are inquiring about what, if

4    anything, the plaintiff Mr. Piroscafo said to this

5    witness in the car, that's what you are seeking.

6         MR. HICKEY:  That's what I'm seeking.  I can

7    rephrase it.

8         THE COURT:  Restate it.  Then the witness will

9    be clear.

10   Q.  To be clear, did the plaintiff Mr. Piroscafo say

11   anything to you during that car ride regarding his

12   observation of the platform before he stepped out to

13   allow the passengers on?

14   A.  He indicated he was aware that the platform was

15   slippery.  He was aware of the conditions.

16   Q.  I'm going to put back up on the screen a portion

17   of Exhibit 2 which is the incident report.  I believe you

18   testified about this portion of Exhibit 2 earlier which

19   is a summary of the statement given by Mr. Piroscafo.  Do

20   you recognize that?

21   A.  I do.

22   Q.  Now, Exhibit 2 says something a little bit

23   different.  Exhibit 2 says that what he told you was he

24   was not sure whether he -- I want to get it right.  He

25   may or may not have added slippery conditions on the

1  platform to his announcements to the customers.  So why

2  is that different than what you testified to as far as

3  the car ride?

4      A.  He was specific in the car ride on our

5  discussion that he was aware of the conditions and that

6  he had warned the passengers of the same.  I thought that

7  was ironic.  Then he had slipped and when we were asking

8  specific questions, I specifically asked him about the

9  car ride conversation, he wasn't sure if he at that time

10  made a specific announcement at that given time.  He was

11  adamant that it read that way.  That's the way he stated

12  it.  That's what I put in.

13      Q.  To be clear, this portion of Exhibit 2, is that

14  the opportunity for you to record what Mr. Piroscafo's

15  version of events was as part of the incident

16  investigation?

17      A.  It is the record of an interview at that time.

18      Q.  It is not a record of your discussions with him

19  on the way back from the hospital or anything else?

20      A.  No.

21          MR. HICKEY: Thank you, sir, that's all I have.

22          THE COURT:  Brief redirect.

23  REDIRECT EXAMINATION BY MR. CANTOR:

24      Q.  You get to the hospital.  He's already there,

25  correct?

1    A.   Yes.

2    Q.   You testified earlier that he appeared to be in

3    pain and he had taken medication, correct?

4    A.   No.   I testified he was given the prescription

5    but he did appear to be in pain.

6         THE COURT:   Unless this is leading somewhere, I

7    don't want you to go over what you already asked him.

8    Q.   Exhibit 2 is there a space on there for Mr.

9    Piroscafo to sign?

10   A.   Yes.

11   Q.   Did he sign it?

12   A.   No.

13   Q.   Did you provide it to him?

14   A.   No.

15   Q.   Did you mail it to him?

16   A.   Nope.

17   Q.   Mr. Hickey asked you about general rule 300, be

18   alert to walking conditions, adjust your gait and

19   activities to accommodate weather.   You weren't there the

20   night of the accident, correct?

21   A.   The morning of the accident?

22   Q.   Yes.

23   A.   No.   I wasn't at that station.

24   Q.   How do you know what his gait was at the time of

25   the accident that he needed to adjust it?

1      A.   Because he fell.

2      Q.   So you assume that because he fell, he had an

3   improper gait?

4      A.   Nobody else fell.

5      Q.   And you don't know what activities he was

6   performing at the time of the incident because you

7   weren't there, correct?

8      A.   I do know what activity he was performing

9   because I asked him.

10      Q.   When it says be alert to walking conditions, in

11   this instance, you would mean on icy, slippery

12   conditions, correct?

13      A.   Weather related the rule says.

14      Q.   Would you agree with me that ice is a slippery

15   condition?

16      A.   It can be.

17      Q.   And would you agree with me that unsalted,

18   unsanded ice can be a slip, trip and fall hazard?

19      A.   It can be.

20      Q.   I want to talk about rule 2008, this key out

21   procedure that seems to only apply if there's assistant

22   conductors but not if there's conductors.  Doesn't the

23   rule state the Conductor can designate one person to key

24   out at each station?

25      A.   He could.

1    Q.  Can he designate himself?

2    A.  He should have.

3    Q.  I read part two and Mr. Hickey read part one.  I

4  want to show the jury part three.  After loading and

5  unloading, the crew member will signal the Conductor

6  using hand signals to indicate close doors and then

7  remain on the platform until all doors have closed and

8  exterior door lights are extinguished.  When assured that

9  no customers are attempting to board or detrain, the crew

10  member will signal the Conductor to proceed and step back

11  into the car and turn the door key to the closed

12  position.  The conductor will then signal the engineer to

13  proceed.  Did I read that correctly?

14    A.  You read it correctly.

15    Q.  Isn't it fair to say that the purpose of that

16  rule is for the safety of the public when they are

17  loading and unloading?

18    A.  It is part of it.

19    Q.  But that doesn't apply when there's only one

20  person on the train is your testimony?

21    A.  There's additional instructions that

22  specifically talk about a single Conductor operation.

23    MR. CANTOR:  That's all I have.

24    THE COURT:  You may step down, sir.  Your next

25  witness, sir.

1        MR. CANTOR:  We will call John Osmun.

2        THE COURT:  If you can come up to the witness

3   stand.  When you arrive, I would ask if you would please

4   remain standing so the clerk may administer an oath to

5   you.

6                    JOHN    OSMUN.

7   Having been called as a witness, was first duly sworn and

8            testified on his/her oath as follows:

9        THE CLERK:  Please state your name, spell your

10  last name, city state of residence.

11       THE WITNESS:  John Osmun, O-s-m-u-n, Meriden,

12  Connecticut.

13  DIRECT EXAMINATION  BY MR. CANTOR:

14       Q.  Good afternoon, Mr. Osmun.  Can you tell the

15  jury where you are employed?

16       A.  Metronorth.

17       Q.  For how long have you worked there?

18       A.  It's going to be 25 years.

19       Q.  And have you worked continuously for MetroNorth

20  for the last 25 years?

21       A.  Except for two small layoffs during the winter

22  my first two years.

23       Q.  Can you basically take us from the date of hire

24  until today, tell us the various job titles you held and

25  the very time frames?

1    A.  I will do the best I can.  From the time I was

2   hired in September 1987 until October 1992, I was a track

3   man at various locations Bridgeport, Stamford, Harmon,

4   New York, then machine operator for a month in Harmon,

5   New York, driving rights, pick-up truck, van, that type

6   of stuff in New York.  Then became a track man again in

7   Bridgeport and got my foreman rights in 1999 and have

8   been a foreman since.

9    Q.  So as a foreman, you are a supervisor in the

10   track department?

11    A.  Right.

12    Q.  Is work in the track department different than

13   work in the transportation department?

14    A.  Yes.

15    Q.  Are the job duties and responsibilities of the

16   track man different from that of a Conductor?

17    A.  Yes.

18    Q.  Can you describe for the jury the job duties and

19   responsibility you had as a track man?

20    A.  We would put in ties.  We would put in rail.

21   The track has a certain gauge which is distance between

22   the two rails for the wheel to ride on.  Sometimes the

23   gauge would have to be adjusted.  We would do that.

24   Surface the track in the wintertime.  We do snow duty,

25   clean switches, clean platforms, just usual maintenance

1    type of stuff.

2         Q.   The employees who perform this snow duty work

3    are they known as track man?

4         A.   They are but when it comes to snow duty,

5    everyone works, the foreman, the driver, nobody stands

6    around.  We all pitch in and work.

7         Q.   Everyone in the track department?

8         A.   Everybody.

9         Q.   In February 2008, who was your direct

10   supervisor?

11        A.   Ronny O'Connor.

12        Q.   Is he still employed by MetroNorth?

13             A JUROR:  Can you say that again?

14        Q.   In February, 2008 who was your direct

15   supervisor?

16        A.   Ronny O'Connor.

17        Q.   Is he still employed by MetroNorth?

18        A.   No.

19        Q.   In February 2008, did you supervise work

20   performed on the New Canaan line?

21        A.   As far as a snowstorm goes?

22        Q.   Yes.

23        A.   Usually on the New Canaan line, 50 percent of

24   the time there are two foreman that are together.  We

25   both are the supervisor.

1       Q.  Can you tell us what the New Canaan line

2  encompasses station wise?

3       A.  Glenbrook, Springdale, the platforms and the two

4  switches up in New Haven so the trains can come out of

5  the yard at rush hour.

6       Q.  What about Talmadge Hill?

7       A.  That's the state or the city.

8       Q.  I want to show you what's been marked

9  Plaintiff's Exhibit 6.  Can you identify Plaintiff's

10  Exhibit 6?

11       A.  This is a map of MetroNorth map of the New Haven

12  line.

13       Q.  And  --

14       A.  Actually it is a MetroNorth system map.

15       Q.  And on there does it show the stations of New

16  Canaan and Springdale and Glenbrook?

17       A.  Yes.

18       Q.  Can I publish this to the jury?

19       THE COURT:  You can.  I want to make sure I find

20  it.  I think you originally marked it as five but we'll

21  treat it as six.

22       Q.  Looking at the monitor, is this area here New

23  Canaan, Springdale and Glenbrook?

24       A.  Yes.  That's the New Canaan branch, yes.

25       Q.  So those are the three stations in the New

1    Canaan branch that you performed snow duty in?

2         A.   We don't handle the platform in New Canaan.

3    Somebody else does that.  We take care of the two

4    switches in the yard and the two platforms Springdale and

5    Glenbrook.

6         Q.   When you talk about the switches in the yard,

7    tell us what you are talking about?

8         A.   A yard is where they store trains when they

9    don't need them so they can get one train in and out for

10   the rush hour to keep the traffic flowing, to get from

11   one track to another, they are called switches and snow

12   will clog up to switch.  They can't throw the switch so

13   we have to clean the switches during the storm.  Also

14   there's only two and they are small so it doesn't take

15   long to do.

16        Q.   Now, with respect to the term snow duty that you

17   mentioned, tell us what your understanding is of snow

18   duty.  What does it encompass?

19        A.   The cleaning the platforms, cleaning the

20   sidewalks, we're supposed to do the stairs.  After the

21   storm is over, put calcium chloride down, that melts

22   whatever layer of ice is left under the snow or any

23   residual snow, stuff like that.

24        Q.   Is there a priority between cleaning the

25   switches versus cleaning the platforms?

1          A.   Platforms always take top priority because

2     that's where people walk.  We would make sure they are

3     cleaned.  Say it snows during the day, we would make sure

4     the platforms are clean by 5:00 so that we can get to New

5     Canaan, have the two switches cleaned out for the first

6     train that goes into that yard which I can't remember

7     offhand what time that is.  Then once the last train all

8     those switching maneuvers are made, then we go back to

9     the platforms.  You are only talking maybe two hours.

10         Q.   Are the platforms to your knowledge kept clean

11    for the public as well as the MetroNorth railroad

12    employees?

13         A.   Yes.

14         Q.   Are you familiar with the term night gang?

15         A.   Yes.

16         Q.   What's your understanding of the night gang as

17    it applies to the track department?

18         A.   A night gang is a gang that works third shift.

19         Q.   What hours are third shift?

20         A.   It depends, some employees 10 to 6, some 11 to 7

21    or 12 to 8.

22         Q.   That's 10 p.m. to 6 a.m.

23         A.   11 p.m. to 7 a.m., midnight to 8 a.m.

24         Q.   Prior to February 23, 2008, were night gangs

25    assigned to the New Canaan line?

1      A.   There was a night gang.  I don't remember when

2  it started, and I don't remember what their hours were at

3  that time.

4      Q.   Are you familiar with the term morning rush

5  hour?

6      A.   Yes.

7      Q.   To your knowledge, from the hours of 6 a.m. to 8

8  a.m. is that morning rush hour?

9      A.   It's six.  I don't remember the hours offhand.

10  It is like six a.m. but I would say to nine or 9:30.

11      Q.   And to your knowledge, during the morning rush

12  hour, are there regularly scheduled trains in the New

13  Canaan line?

14      A.   Yes, but rush hour only applies to during the

15  week, not on the weekend.

16      Q.   When we're talking about the New Canaan line,

17  we're including Springdale station, correct?

18      A.   Yes.

19      Q.   I have marked and given you to Plaintiff's

20  Exhibit 7.  Do you recognize the handwriting on the

21  Exhibit 7?

22      A.   Yes.

23      Q.   Whose handwriting is it?

24      A.   Ronny O'Connor's.

25      Q.   Do you have an understanding of what the notes

1    on the Exhibit 7 are?

2         A.  Yes.

3         Q.  Can you tell the jury what they are?

4         A.  This is a list of everything that everybody in

5    the subdivision did for during the day.  The foreman's

6    name would be first, then who he had with them or the

7    number of people he had with them and what their jobs

8    were for that day.

9         Q.  May I publish this to the jury?

10             THE COURT:  You may.

11        Q.  I want to direct your attention here to the

12   first set of notes for Wednesday, February 20, 2008.  Do

13   you see that?

14        A.  Yes.

15        Q.  Did you work on that day?

16        A.  Yes.

17        Q.  And that's right here where your name appears

18   with Mr. Viora?

19        A.  Number 3, yes.

20        Q.  Says ICCCP 2:41, correct?

21        A.  Yes.

22        Q.  What does that mean?

23        A.  I C C stands for interstate commerce commission,

24   that's the federal thing we do every month for switch

25   inspection.  We go out and take the gauge on every switch

1    and every interlocking.

2         Q.   You were doing that on February 20, 2008?

3         A.   Yes, CP241 is South Norwalk.

4         Q.   From looking at the notes from Wednesday,

5    February 20, were any specific employees assigned to the

6    snow gang that day?

7         A.   No.

8         Q.   All right.   Now, the evening of Wednesday,

9    February 20, was there a night gang?

10        A.   Yes.

11        Q.   What do they do?

12        A.   The gang distributed calcium on the main line.

13   They would take a pallet or two of calcium, go to the

14   first station, at this time Mount Vernon, put so many

15   bags of calcium on the platform.

16        Q.   Would they do that at the Springdale station?

17        A.   Yes.

18        Q.   As part of the main line?

19        A.   Part of the territory.   Main line is usually

20   considered from Grand Central up to New Haven then New

21   Canaan branch, Danbury branch, Waterbury branch.   Because

22   it is part of the territory, they would do that, too.

23        Q.   In February 2008, did MetroNorth have a storage

24   facility in Springdale?

25        A.   Yes.

1    Q.  Was calcium stored there?

2    A.  At times, yes.

3    Q.  Was snow removal machines kept there?

4    A.  Yes.

5    Q.  Now I want to refer you to Thursday, the 21,

6  continuing on the next page for one through seven.  First

7  of all, tell me are you listed on there at all?

8    A.  Yes.

9    Q.  And you worked with Mr. Hassel?

10   A.  Yes.

11   Q.  What did you do that day?

12   A.  Switch inspection, CP234 which is Stamford.

13   Q.  For jobs one through seven, did anybody do any

14  snow duty?

15   A.  No.

16   Q.  Now, I want to show you a second part of that

17  day, Thursday February 21, 8 through 10, 8 through 11,

18  did anybody do any snow duty on Thursday, February 21?

19   A.  No.

20   Q.  Was there a night gang?

21   A.  Yes.

22   Q.  What did the night gang do?

23   A.  They cleaned up the yard at Springdale, Viaduct

24  Road and they stayed until 8 a.m. to cover Danbury yard

25  but I don't know the reason why.

1      Q.  On that particular day, they worked all the way

2  until eight a.m. in the morning?

3      A.  Yes.

4      Q.  Friday, the 22 of February, 2008, pursuant to

5  Exhibit 7, did you work that day?

6      A.  Yes.

7      Q.  And what did you do that day?

8      A.  Snow duty.

9      Q.  And where did you do snow duty?

10      A.  New Canaan branch.

11      Q.  Who did you work with that day?

12      A.  John Rachie.

13      Q.  As you sit here today, do you recall

14  specifically what work you did on the New Canaan branch

15  on February 22?

16      A.  I can't recall specifically that day but I know

17  because we were on the New Canaan branch, we did the two

18  platforms and did the yard switches in New Canaan.

19      Q.  It says under February 22, 2008, that the snow

20  started approximately what time?

21      A.  4 a.m.

22      Q.  And was approximately how much snow by 8 a.m.?

23      A.  Three inches.

24      Q.  And at the bottom of that exhibit for Friday,

25  February 22, what does it say regarding when the storm

1    with rain stopped?

2        A.   Looks like snow with rain stops approximately 8

3    p.m. three to six inches accumulates.

4        Q.   Do you know who measured the three to six inches

5    of accumulation?

6        A.   No, I don't.

7        Q.   Was a night gang used on February 22?

8        A.   It could have been.  It is not stated here

9    whether they came in or not.

10       Q.   But referring to Exhibit 7, when a night gang

11   was used on the 20th of February, it was referred to

12   specifically, correct?

13       A.   Yes.

14       Q.   When a night gang was used on Thursday, February

15   21, it was referred to specifically, correct?

16       A.   Yes.

17       Q.   There's no specific reference on Friday, the 22,

18   to a night gang, correct?

19       A.   Correct.

20       Q.   Now, on Saturday, February 23, what was the

21   activity that was performed that day?

22       A.   The Saturday gang came in, checked the platforms

23   and distributed calcium.

24       Q.   I want to refer you to Exhibit 8 which is a

25   multi-page document, and is it fair to say all the

1     exhibits in Exhibit 8 are the same form throughout the

2     exhibit?

3          A.   Yes.

4          Q.   And it is entitled Track Department Daily Work

5     Log, correct?

6          A.   Yes.

7          Q.   And can you just tell the jury what's the

8     purpose of this particular form?

9          A.   This is a form we fill out every day with the

10    names of the people who work under each foreman, their

11    title, their man number, the hours of regular time they

12    worked which is 8 a.m. to 4 p.m.  Any overtime they

13    worked and their signature, the rule of the day, the

14    check marks on the right as far as the job briefing goes,

15    making sure everybody understood the job briefing.  The

16    location of job assignments where we worked what we did,

17    what time we started, what time we finished.  The left

18    side is cut off it says job status.  That's usually

19    complete.  Materials used and the last line is the truck

20    number.

21         Q.   Is it fair to say this is a document you are

22    familiar with?

23         A.   Yes.

24         Q.   This is a document that's kept by MetroNorth in

25    a regular course of business?

1    A.  Yes.

2    Q.  To a certain extent this time is used to keep

3  the hours an employee works, correct?

4    A.  Yes.

5    Q.  Is it important to keep accurate records of who

6  worked what hours?

7    A.  Yes.

8    Q.  I would like you to turn to the 8th page of that

9  document dated February 22, 2008.  That has your name on

10  it.  Do you have that?

11    A.  Yes.

12    Q.  So on February 22, 2008, it shows that you

13  worked as foreman, correct?

14    A.  Yes.

15    Q.  And what time did you arrive on the job that

16  day?

17    A.  We arrived at Springdale at 8 a.m.  We

18  immediately got everything together to do what we had to

19  do for the day.  The snowblowers, the shovels, the

20  brooms.  We loaded them on the truck.  Make sure they

21  started.  Made sure we had fuel and left for New Canaan

22  line at 8:45.

23    Q.  The work you referred to is that visible on

24  Exhibit 8 where it says location and job assignment, job

25  prep, time arrived departed 8:45?

1      A.   Yes.

2      Q.   What work did you perform next?

3      A.   I don't remember which station first but

4  probably Glenbrook since it was right down the street.

5  We went and cleaned the platforms, both of the platforms

6  were cleaned, we went to the switches and cleaned the

7  switches real quick.  More than likely, I'm telling you

8  if we did it today, then we would go back and clean the

9  platform.  There's so much snow accumulation throughout

10  the day.  To make sure they were clean for rush hard so

11  we would go to New Haven and clean the switches.

12      Q.   What do you do to clean the switches?

13      A.   They are called switch rods that go from on rail

14  to the other rail that causes both switch points, I will

15  say flow over.  It is railroad terminology.  To cross

16  over to the other side of the rail so that the train can

17  diverge from one track to another.  We clean the entire

18  switch itself inside the switch points and the rails, to

19  make sure it doesn't hang up anyway the plates, around

20  the switch stands, the Conductor can get off the train

21  and walk around a clean area.  All around the rods

22  stuffed with the switch machine.

23      Q.   Can you give us a time variance as to how long

24  it takes you to clean out the switches, when there's not

25  a lot of snow versus when there's more accumulation?

1      A.  If there's not a lot of accumulation 15, 20

2  minutes.  If there's a lot of accumulation 45 minutes to

3  an hour.  That's in the worst conditions like that

4  blizzard last year.  We had two feet of snow.

5      Q.  We don't want to talk about that.  When you are

6  talking about that time frame, are you talking about per

7  switch?

8      A.  Per switch.  If there's only a couple of inches,

9  it doesn't take long.

10      Q.  February 22, 2008, after you did the job

11  preparation, it says you did snow duty to New Canaan line

12  from when to when?

13      A.  9 a.m. to 10 p.m.

14      Q.  Now I want to refer you to a couple of pages

15  back in Exhibit 5 to February 23, 2008, do you see that?

16      A.  Yes.

17      Q.  Now, did you work that day?

18      A.  No.

19      Q.  Can you tell me reviewing that page whether or

20  not there was any work done that day?

21      A.  Yes, there was.

22      Q.  What time did the work begin on February 23,

23  2008?

24      A.  The time sheet shows 8:00.

25      Q.  That was with a job?

1      A.   Roadway worker.  It is like a job briefing.  It

2  is associated with it.

3      Q.   And that took from 8 a.m. to 8:15?

4      A.   Yes.

5      Q.   And then what was done between 8:30 and 4?

6      A.   Distribute calcium, clean platforms, main line

7  Mount Vernon, Harrison, Springdale and Glenbrook.

8      Q.   Mount Vernon and Harrison where are those

9  related in Springdale and Glenbrook?

10      A.   Those are on the main line.

11      Q.   Can you show me?

12      A.   Mount Vernon is right here.  Harrison is right

13  here.

14           THE COURT:  I don't know if you are aware you

15  can mark -- he can use his finger to mark the screen.  It

16  won't be saved.  If you want it saved, then he needs to

17  mark the paper.  Just letting you snow.

18           MR. CANTOR:  Thank you.  If you can mark on

19  there and circle Mount Vernon.

20      A.   Here's Mount Vernon and here's Harrison.

21      Q.   Can you initial both MV and Harrison.  Can you

22  also mark on there the New Canaan line by circling that?

23      A.   The whole branch?

24      Q.   Yes.  Put your initials by that.  Showing you

25  Exhibit 6 to the jury here, the Mount Vernon line is

1    circled as I'm indicating here that you circle, correct?

2         A.   Yes.

3         Q.   And goes all the way to Harrison?

4         A.   Yes.

5         Q.   So on February 23, that was clean as part of the

6    work performed, correct?

7         A.   That's what the paper shows, yes.

8         Q.   Then the New Canaan line was also worked on,

9    correct?

10        A.   Yes.

11        Q.   Based on Exhibit Number 8, do we know at what

12   point in time the Springdale station was worked on?

13        A.   No.

14        Q.   What's your best estimate as to what time work

15   would have begun on February 23, 2008 regarding snow

16   removal at Springdale?

17             MR. HICKEY:  Objection.  Speculating at this

18   point.

19             THE COURT:  You are.  On the day he wasn't

20   there.  He's only testifying from the record.

21        Q.   From the record he regularly reviewed as a

22   foreman and familiar with.  He hasn't any difficulty

23   testifying to.

24             THE COURT:  Unless he can tell me that it is on

25   that record, I don't see how he can testify.

1      Q.  Based on the record, what's the earliest that

2  snow removal would have begun based on the record?

3      A.  8:30.

4      Q.  That would have been if they went directly from

5  the safety briefing to Springdale, correct?

6      A.  I don't know where they went first.  It says

7  8:30 so that's why I'm saying 8:30.

8      Q.  With respect to the New Canaan line back in

9  February 2008, was there a regularly scheduled train that

10  left New Canaan on Saturday mornings?

11      A.  Yes.

12      Q.  And as you sit here today, do you know when if

13  at all on February 23, 2008, the platforms were inspected

14  at Springdale after 6:40 in the morning?

15      A.  I do not know.

16      Q.  I would like you to take sometime and look at

17  Exhibit 8, the rest of the pages that I did not ask you

18  about and tell me if there's other paperwork that

19  indicates the Springdale station had snow duty work on

20  February 23, 2008 other than what I have shown you on the

21  screen.

22      A.  No.

23      Q.  Is there someone at MetroNorth who is

24  responsible for monitoring the weather conditions?

25      A.  I would assume there is.  I don't know who.

1    Q.  When you were told to perform snow duty, do you
2    know what the chain of command is how that order comes
3    down to you to perform snow removal?
4    A.  My supervisor or if he isn't there, my assistant
5    supervisor, will tell us what we're doing and where we're
6    going, and we all know to get the necessary machinery and
7    material and go to the station.
8    Q.  Some supervisor informs you that the weather is
9    such that snow or Ice removal are warranted?
10   A.  Yes.
11   Q.  Are you aware on occasion that after MetroNorth
12   performs snow removal that snow may come down between the
13   last time you last performed snow duty and the regular
14   scheduled track duty is assigned to check the track
15   platform?
16   A.  It could happen.
17   MR. CANTOR:  Thank you, your Honor.  That's all
18   I have of this witness.
19   THE COURT:  Cross-examination.
20   MR. HICKEY:  Thank you, your Honor.
21   CROSS-EXAMINATION BY MR. HICKEY:
22   Q.  Good afternoon, Mr. Osmun.
23   A.  Good afternoon.
24   Q.  Let's recount a little bit here.  How many hours
25   did you work on February 22, 2008?

1          A.   Eight hours regular time which I do on a daily

2    basis during the week, six hours of overtime.

3          Q.   You put in a 14-hour day that Friday?

4          A.   Yes.

5          Q.   That's a Friday, if you remember?

6          A.   It says Friday.

7          Q.   It says that you left at 10:00 that night.  Can

8    you testify -- I don't know if you have a recollection --

9    were you told to leave at 10:00 regardless of what the

10   condition or the platforms were or were you told to leave

11   after the work was done?

12         A.   I'm going to once the snowstorm is over, we

13   clean them up, we salt them up, and we don't do any

14   salting until the snow is over because if you do then it

15   makes a mess of everything.  The slush freezes, and it's

16   more of a hazard than if the snow sticks to the platform.

17   Every couple of hours our boss would call what's it doing

18   out.  How much snow on the ground?  He would say okay and

19   check back later.  If the snow stops without him calling

20   us, we would go out there and make sure the platform is

21   100 percent clean and the calcium is down.  He would say

22   something along the lines, okay, clean it.  Finish it up

23   then come on which means head back to the headquarters.

24   If it is still snowing, then he would say okay, well,

25   keep me informed or he would check back with us later.

1     Q.  So you weren't told to come in at 10 because it
2     was 10?  You were told because once the storm is over,
3     finish your work and come in?
4     A.  Right.  If the storm was over at 12, we would
5     work until the storm was over and we cleaned it which
6     would have been one or 2:00 in the morning.
7     Q.  The record shows that this storm ended at what
8     time?
9     A.  Snow stops approximately 8 p.m.
10     Q.  So by 10:00, what was the condition of that
11     platform?
12     A.  By 10:00 when we left, that platform was
13     100 percent wet.  We wouldn't even put any ice on there,
14     just in case somebody slipped and fell, even if you had
15     put extra calcium on there because the calcium melts
16     everything and turns to water.
17     Q.  You don't know what happened between 10 p.m. and
18     6:00 the next morning.  You weren't there?
19     A.  I have no idea.
20     Q.  We know from the records some stations were
21     addressed the next day.  Let me put Exhibit 6 back up.
22     Did I remember right that it is from Mamaroneck up to
23     Harrison is that it or longer.  New Rochelle to Harrison?
24     A.  Mount Vernon to Harrison.
25     Q.  Was the Stamford station, did that have to be

1   addressed again?

2       A.   The N B takes care of that.   I don't know what

3   the conditions of the other platforms were.

4       Q.   How about Noroton Heights or Darien?

5       A.   Somebody else does that the town or city or

6   state.

7       Q.   How about the Cos Cob or Greenwich?   Is that

8   your department?

9       A.   No.

10      Q.   So your department took care of some stations,

11  down a little bit lower into the New York border, then

12  they went back to Glenbrook and Springdale?

13      A.   They could have done Glenbrook, Springdale first

14  or second.   I wasn't there.   I don't know.

15          MR. HICKEY:   That's all I have, your Honor.

16  REDIRECT EXAMINATION BY MR. CANTOR:

17      Q.   You talked about that some of the stations are

18  done by municipalities or other sources, correct?

19      A.   Yes.

20      Q.   But the Springdale station was the

21  responsibility of MetroNorth railroad, correct?

22      A.   Yes.

23      Q.   As a foreman, can you tell me was a track crew

24  available earlier than 8:30 a.m. on Saturday, February 23

25  if MetroNorth needed it?

1        A.   It all depends if the night gang came in or not.

2   I don't know.   I don't know.   I'm not involved in whether

3   the night gang comes in or not so.

4             MR. CANTOR:   Thank you.

5             (End of excerpt.)

6

7

8

9

10   COURT REPORTER'S TRANSCRIPT CERTIFICATE

11   I hereby certify that the within and foregoing is a true

12   and correct transcript taken from the proceedings in the

13   above-entitled matter.

14

15   /s/  Terri Fidanza

16   Terri Fidanza, RPR

17   Official Court Reporter

18

19

20

21

22

23

24

25

## <u>INDEX</u>

**EXAMINATION**

**Witness Name**                                                      **Page**

PHILIP WILHELMY
    Direct By Mr. Cantor ........................................... 2
    Cross By Mr. Hickey ........................................... 34
    Re-Direct By Mr. Cantor ....................................... 49
JOHN OSMUN
    Direct By Mr. Cantor .......................................... 53
    Cross By Mr. Hickey ........................................... 72
    Re-Direct By Mr. Cantor ....................................... 75